*134 Opinion
GEORGE, C. J.
Defendant Jeffrey Gerard Jones was convicted, following a jury trial, of two counts of first degree murder (Pen. Code, §§ 187, 189)[1] and one count of attempted first degree murder (§§ 664/187). The jury found true the allegations that defendant personally had used a deadly or dangerous weapon (a hammer) in the commission of each offense (§ 12022, subd. (b)) and found, as special circumstances, that defendant had been convicted in this proceeding of multiple murders (§ 190.2, subd. (a)(3)). The jury further found that defendant, who had pleaded not guilty by reason of insanity, was sane when he committed the charged offenses. Following the penalty phase of the trial, the jury set the penalty at death. This appeal from the resulting judgment of death is automatic. (§ 1239, subd. (b).) For the reasons that follow, we affirm the judgment in its entirety.
I

Competency Hearings

On January 25, 1985, a felony complaint was filed charging defendant with the present offenses. On March 1, 1985, the municipal court suspended the criminal proceedings and transferred the case to the superior court under section 1368 for a determination of defendant’s mental competence to stand trial.[2] The superior court appointed Dr. Bruce Kaldor and Dr. Captane Thomson to examine defendant.
The parties waived their right to a jury and, on September 6, 1985, a hearing to determine defendant’s competence to stand trial commenced before Superior Court Judge Benjamin Diaz. Following a five-day hearing, Judge Diaz ruled that defendant was not competent to stand trial and, on October 1, 1985, ordered that he be committed to Atascadero State Hospital. *135 After four months at that facility, officials there determined that defendant’s competency had been restored and, on February 3, 1986, the superior court ordered that defendant be returned from the state hospital and that criminal proceedings be resumed.
On October 13, 1987, defense attorney Jessie Morris filed a declaration pursuant to section 1368 expressing doubt as to defendant’s competency to stand trial. The superior court again suspended proceedings and reappointed Dr. Kaldor to examine defendant. A jury trial on the issue of defendant’s competency commenced on March 1, 1988. As explained more fully below, defendant presented evidence indicating that he suffered from paranoid schizophrenia and was receiving heavy doses of medication to control the symptoms of that disease. Defendant contended that both the disease itself and the side effects of the medication rendered him incompetent to stand trial. The prosecution countered that defendant was malingering by exaggerating his symptoms of mental illness. The jury found that defendant was competent to stand trial, and the case proceeded to trial.

Guilt Phase

The trial began on July 18, 1988. The evidence introduced at the guilt phase of the trial showed the following:
Shortly after noon on January 21, 1985, Harry Dong was found lying on the floor of a restroom at Sutter’s Fort in Sacramento. He was bleeding profusely from severe wounds to his head and face. Larry Button, an emergency medical technician who treated Dong at the scene, described the victim’s face as “pretty well destroyed.” The fly on the victim’s pants was open, and the victim’s penis was outside his shorts.
Button noticed defendant, who appeared to be a transient, standing outside the restroom and heard defendant tell another man that the victim’s “face was bashed in." This comment attracted Button’s attention because the victim’s injury had been reported as a possible gunshot wound, and appeared to the technician to have been caused by a shotgun.
Dr. Hugh Moore, a physician specializing in otolaryngology (head and neck surgery), treated Dong at the emergency room of the Sacramento Medical Center of the University of California. Dong’s injuries were caused not by a gunshot, but by many blows with a blunt instrument, such as a baseball bat, the curved end of a crowbar, or a hammer. Dong subsequently died as a result of his injuries.
At approximately 5 p.m. that same day, January 21, 1985, medical student John Rowland entered the men’s restroom in the lobby of the Sacramento *136 Medical Center and began to use one of the urinals. The next thing he knew, he was lying on the floor in a pool of blood, with his head spinning. He tried to call for help but was unable to yell very loudly. He crawled to the door, raised himself up, and grabbed the door handle. As the door opened, he fell backwards into the lobby.
Rowland was rushed to the emergency room. Dr. Moore, who was in the operating room treating Dong, was summoned to treat Rowland. Dr. Moore was struck by the fact that Dong and Rowland had sustained “very similar” injuries on the same day, although Dong’s injuries were more severe than Rowland’s. It appeared that Dong had received many more blows. The injuries to both victims could have been caused by a hammer.
While Rowland was being treated, a nurse noticed defendant standing in the hallway just outside the emergency room. Defendant stayed for five or ten minutes and then left.
Rowland survived and was operated upon by two teams of surgeons to repair a series of fractures extending from the rear of his head to the right side of his jaw. He was rendered deaf in one ear, and one side of his face is paralyzed and numb, his balance is impaired, and he has continuing dental problems.
Shortly after 5 p.m. on the following day, January 22, 1985, Ronald English, an intern at the Sacramento Medical Center, was passing near the men’s restroom in the emergency room when he heard a scream and saw people pointing toward the door of the restroom. English approached, and saw defendant leaving the restroom. English put his hand on defendant’s shoulder and asked him whether he was all right. Defendant responded: “That guy in there is crazy.” As English and defendant were talking, Parmand Sharma, a custodian at the medical center, entered the restroom and yelled for help, saying someone had been injured. Defendant brushed English’s hand off of his shoulder and “took off running.” English chased defendant and called for help, while Sharma summoned the campus police. With the help of a bystander, English tackled defendant and held him until campus police officer William Davisson arrived.
As Officer Davisson handcuffed defendant, he noticed a wooden handle protruding from the waistband at the rear of defendant’s pants, and then removed a claw hammer from defendant’s pants. Officer Davisson learned via his walkie-talkie that an assault had occurred, and responded that he had a suspect in custody. Defendant, who apparently had overheard this conversation, stated: “I have been framed." When subsequently booked, defendant was able to follow simple instructions without apparent difficulty.
*137 While defendant was being pursued, emergency room nurse Jeffrey Howell entered the restroom and found Dr. Michael Corbett slumped in front of the urinal, bleeding profusely from the back of his head. Corbett’s breathing was slow and irregular, and he was nonresponsive and near death. Despite efforts to resuscitate him, Corbett died as a result of his injuries.
Autopsies revealed that Dong and Corbett died as the result of having received multiple blows from a blunt instrument. Their injuries were quite similar, and both victims displayed circular bruises, approximately one inch in diameter. The hammer found in defendant’s possession could have caused Dong’s and Corbett’s injuries. There were no defensive wounds to indicate that either Dong or Corbett attempted to fend off his attacker.
Dr. Bahram Cherazi, a neurosurgeon who operated on both Corbett and Rowland, testified that the injuries suffered by both victims were quite similar and “appeared to be imparted by a rounded, pointed but not necessarily a sharp object . . . with a great deal of force.” Both Corbett’s and Rowland’s injuries could have been inflicted by using the hammer seized from defendant.
Evidence of the following uncharged similar offense was admitted for the limited purpose of proving that defendant was the individual who committed the charged offenses. Shortly after noon on January 18, 1985, three days before Dong was killed, Jere Lipps, a professor of geology at the University of California at Davis, heard someone turn the doorknob of the locked door to his office, and then knock on the door. Professor Lipps opened the door, found defendant standing there, and asked defendant what he wanted. Defendant said he was looking for a friend. When defendant mentioned a room number, Professor Lipps gave him directions to that room. As they spoke, defendant looked over Professor Lipps’s shoulder into the office. Professor Lipps returned to his office and closed the door but, because defendant had acted suspiciously during their encounter, Professor Lipps soon returned to the hallway to see where defendant had gone and was startled to find him still standing near the door. After Professor Lipps repeated the directions he had given earlier, defendant started down the hallway, walking stiffly, with his right arm pressed to his side. Defendant entered a restroom and, a minute or two later, came out and hurried down the hall.
A few minutes after defendant left the restroom, Professor James McClain entered and found the body of Professor Fred Morris lying on the floor near the urinal in a pool of blood. The zipper on the victim’s trousers was down.
An autopsy revealed that Morris died “from multiple blunt injuries to the skull.” Morris had sustained a circular wound, about an inch in diameter, *138 below his left ear; the left side of Morris’s jaw had been shattered, and he had a third wound above his left ear. All of the wounds could have been inflicted by using defendant’s hammer.
Bloodstains found on the clothing worn by defendant at the time of his arrest were analyzed and found to be inconsistent with defendant’s blood type and consistent with the blood types of victims Corbett, Rowland and Dong. One bloodstain revealed a trait present in Corbett’s blood that appears in only six persons in a thousand. Bloodstains also were found on the hammer seized from defendant. One stain was inconsistent with defendant’s blood and could have been a mixture of blood from several persons.
Defendant presented an alibi defense to the uncharged offense and to one of the charged offenses, through the testimony of his aunt, Hazel Sadler, who stated that he was at home at the time of the commission of the uncharged murder of Morris on January 18, 1985, and the charged murder of Dong on January 21, 1985. Defendant also presented the testimony of Judy Zimmerman that, at the time of the Dong murder, she was eating lunch near the restroom at Sutter’s Fort and did not notice defendant or any other African-American man in the area.
At the conclusion of the guilt phase, the jury found defendant guilty of two counts of first degree murder and one count of attempted first degree murder, found that he had used a deadly or dangerous weapon in the commission of each offense, and finally found, as a special circumstance, that he had been convicted in this proceeding of multiple murder.

Sanity Phase

As noted above, in addition to pleading not guilty, defendant pleaded not guilty by reason of insanity and, accordingly, a sanity phase hearing was conducted after the jury returned its verdicts at the guilt phase.
At the commencement of the sanity phase hearing, the parties stipulated that the evidence introduced during the guilt phase could be considered by the jury at the sanity phase. In addition, defendant’s mother and two family friends testified to defendant’s increasingly aberrational behavior during the years leading up to the charged offenses, including lack of personal hygiene, paranoid behavior, and complaints of hearing voices. A childhood friend of defendant testified to a marked change in defendant’s behavior during or after defendant’s years in high school. After leaving high school, defendant did not bathe regularly, wore dirty clothes, had difficulty communicating, and acted strangely.
*139 Several psychiatrists and other mental health professionals testified on behalf of defendant that he suffered from paranoid schizophrenia and was receiving heavy doses of medication to control the symptoms of that disease. Several of these physicians opined that defendant was not legally sane at the time of the offense, but also acknowledged that defendant displayed an antisocial personality disorder and that it was difficult to determine whether a patient was malingering. The prosecution introduced no evidence during the sanity phase of the trial.
The jury found that defendant was sane when he committed the charged offenses.

Penalty Phase

A psychiatrist and a clinical psychologist offered further details regarding defendant’s mental illness and antisocial personality disorder. Family members and friends testified that defendant appeared normal during childhood but showed signs of mental illness during and after his years in high school. The prosecution presented no evidence during the penalty phase of the trial.
The jury returned a verdict of death.
n

Competency to Stand Trial

As noted above, two hearings were held under section 1368 to determine defendant’s competency to stand trial. Defendant asserts he was denied due process of law because the trial court failed to initiate a third competency hearing. We describe in some detail the evidence introduced at the second competency hearing.
Dr. William Greenough, an emergency room physician at Sutter-Davis Hospital in Davis, the city where defendant resided with his mother, testified at the jury trial on the issue of defendant’s competency that on August 3, 1983, a year and a half before the present offenses, defendant entered the emergency room with a “variety of complaints,” including that his head was “splitting open,” he felt as if he were “turning into two different people,” and he feared he had been poisoned with embalming fluid. Following a physical examination that disclosed no medical problems, and a psychiatric examination, Dr. Greenough diagnosed defendant as having “a severe psychiatric mental disorder, most probably paranoid schizophrenia, which had most probably been present for many years.” He did not believe defendant was *140 malingering. Dr. Greenough arranged for defendant to be admitted to the psychiatric unit at Woodland Memorial Hospital.
Although defendant entered the hospital voluntarily, he later became hostile and asked to be discharged. Dr. Edward Doehne determined that defendant was a danger to himself and others, placed a 72-hour hold on defendant pursuant to Welfare and Institutions Code section 5150,[3] and administered to him, by injection, the antipsychotic medication Prolixin.[4] At one point, defendant attempted to leave the hospital and was placed in restraints for several hours. Defendant later consented to take his medication orally, and his condition seemed to improve.
Dr. Theodore Hoffman, Jr., a psychiatrist, also treated defendant at Woodland Memorial Hospital and concluded defendant “was experiencing a paranoid schizophrenic disorder of a grandiose type.” Dr. Hoffman believed defendant truly was psychotic and was not elaborating upon his symptoms.
At the conclusion of the 72-hour period, Dr. Doehne requested that defendant be held for an additional 14 days,[5] but that request was denied and defendant was released on August 8, 1983.
On May 1, 1984, Dr. Greenough again examined defendant in the emergency room of the Sutter-Davis Hospital. Defendant complained he was “feeling bad all over” and described many ailments, including “a burning pain ‘in the middle of [his] brain.’ ” A physical examination disclosed no *141 medical problems, and Dr. Greenough reaffirmed his conclusion that defendant “had a major psychiatric problem, which was probably paranoid schizophrenia.” He believed defendant’s mental condition had worsened from when he had seen defendant eight months earlier. Defendant again was referred to Woodland Memorial Hospital, where Dr. Hoffman prescribed the psychotropic medication Navane.
Gillian Rumsey, a psychiatric nurse who is the program manager of the Sacramento County jail psychiatric services, met defendant in January 1985 shortly after his arrest on the current charges, when defendant became a prisoner at the county jail. From January to March of 1985, defendant refused medication, did not communicate verbally, and did not bathe regularly. When Rumsey would enter his cell, which was scattered with garbage, defendant would turn away and stare at the wall. In March 1985, Rumsey had defendant transferred to the psychiatric unit of the jail for 72 hours of observation, because defendant had been pacing in his cell and appeared agitated. Defendant was involuntarily medicated with the neuroleptic Haldol but, when returned to a regular cell, refused further medication.
On March 19, 1985, Dr. Bruce Kaldor, a psychiatrist appointed by the municipal court to evaluate defendant’s competency to stand trial, examined defendant in his jail cell. Defendant appeared alert but refused to communicate with Dr. Kaldor. The jailers with whom Dr. Kaldor spoke had not observed defendant talking to himself or appearing to hear voices. Dr. Kaldor testified that defendant could be competent to stand trial even though he suffered from paranoid schizophrenia; “[A] paranoid schizophrenic can be quite competent. Competency does not necessarily equate with mental illness. So a person may have the disease of schizophrenia and be personally able to stand trial due to his competency.” Dr. Kaldor added that a person with antisocial personality disorder also may be competent to stand trial, and that a person with an antisocial personality disorder is more likely to malinger or fake a mental illness.
Nurse Rumsey testified that defendant remained unmedicated until July, when he again became agitated, yelling threats, disrobing and standing nude in his cell, and inducing vomiting and spreading the vomitus on the walls. Defendant again was transferred to the psychiatric unit and involuntarily medicated with Haldol. After 14 days, defendant was returned to the regular jail population and agreed to continue his medication voluntarily. To decrease side effects, his medication was changed to the neuroleptic Thorazine Prolixin.
On August 22,1985, Dr. Kaldor examined defendant in an interview room at the jail. Dr. Kaldor told defendant he was there to determine whether *142 defendant was competent to stand trial, but defendant did not respond initially. After Dr. Kaldor several times requested defendant’s cooperation, defendant stated: “I’m hearing voices, hallucinating.” Dr. Kaldor asked defendant about the voices, but defendant would not elaborate. Later, defendant added: “I am seeing things.” When asked what he was seeing, defendant replied: “Eyeballs.” About 15 minutes into the interview, defendant turned his back on Dr. Kaldor and refused to say anything more. Dr. Kaldor considered reports from jailers who said that defendant appeared to be rational, read the newspaper, and conversed with other inmates. Dr. Kaldor stated that these reports “raised the question in my mind as to whether Mr. Jones was malingering .... And essentially I gave him the doubt. [<fl] I thought the likelihood was greater that he was incompetent than competent . . . .” As noted above, the court concluded that defendant was not competent to stand trial and committed him to Atascadero State Hospital.
Dr. Harold Carmel was a staff psychiatrist at Atascadero State Hospital when defendant was admitted on October 16, 1985. The initial assessment of defendant was that he was psychotic, possibly suffered hallucinations from an organic cause, and possibly was malingering. On October 23, 1985, after a week of examinations, the staff noted “many inconsistencies in his story which suggest a conscious deceptiveness.” The initial diagnosis of psychosis was confirmed, but with a “possibility of some degree of malingering.” Dr. Carmel examined defendant on October 28, 1985 and concluded he “probably had a chronic psychosis with an element of malingering.”
On October 29, 1985, a psychiatric technician observed defendant tell another patient “that he wasn’t going to leave the hospital for a long time, just watch. And then he laughed.” On November 4, 1985, a psychiatric technician heard defendant say: “I am incompetent and will be for a long time.” This was unusual because “the concept of incompetence is actually one of the more difficult things for an incompetent person to grasp. It is an abstract concept.” Defendant’s behavior was a problem. He was involved in a minor tussle with another patient, and defendant’s privilege to be in the halls was withheld. Defendant would pressure lower functioning patients for cigarettes and coffee. On November 11, 1985, defendant said to a female psychiatric technician: “I’ll give you loving, gal; just get over here right now.” When the technician told him his behavior was inappropriate, he responded: “I’m mentally ill. I can’t help what I say.” This showed that defendant understood “that there is the possibility of being excused from behavior as a result of the mental illness.” On November 18, 1985, a psychiatric technician heard defendant say: “I am incompetent, I don’t remember anything about my crime,” and then laugh. But on January 8, 1986, Dr. Carmel overheard defendant tell another patient: “They got the weapon and blood stains, but they ain’t got no witnesses.”
*143 Social worker Lawrence Thomson reported that defendant acted slow and dulled in formal settings, but was more lively and alert with other patients. In all, defendant’s behavior was “consistent with a man with a chronic psychiatric illness who is exaggerating his symptoms[;] who was malingering in that sense.” On December 4, 1985, defendant asked social worker Thomson for help in completing an application for disability payments under social security. Thomson noted that defendant seemed “rational and focused when he wants his needs met.” From December 5-12, 1985, psychological tests were administered to defendant by psychologist intern James Frank under the supervision of staff psychologist Dr. Riley. The resulting diagnosis was “schizophrenia, paranoid type in remission, malingering and antisocial personality disorder.”
Defendant was taking 40 milligrams of Navane per day while at Atascadero State Hospital. He was required to take his medication, but complied willingly and told Dr. Carmel that he needed his medication to stay competent.
After defendant was returned to jail from Atascadero on February 7, 1986, he was taking 40 milligrams of Navane per day and 4 milligrams of Cogentin to control side effects. Between June and October 1986, defendant requested an increase in his medication, stating he was hearing voices, and his daily dose of Navane was increased to 50 milligrams. Rumsey reported “there was a marked improvement in his appearance, in his behavior, in the condition of his cell, in his personal hygiene.” Defendant “reported a decrease in the volume and frequency of the voices.”
In July 1986 and August 1987, Dr. Daniel Edwards, a clinical psychologist, administered intelligence tests that indicated defendant was retarded. Dr. Edwards noted that defendant had scored significantly higher on an intelligence test conducted at Atascadero State Hospital late in 1985. This change in performance could have been caused by a worsening of defendant’s psychosis or could indicate that defendant was malingering. Dr. Edwards noted that a personality test conducted at Atascadero State Hospital was deemed invalid “because of the high score on one of the validity checks.” Dr. Edwards explained that defendant had “checked so many symptoms and the scale was so elevated in terms of pathological condition that either he didn’t understand what he was doing and maybe checked randomly ... or was malingering.”
Although defendant had graduated from high school in the 44th percentile of his class, having received a B in algebra, defendant performed at a preschool level on a vocabulary test administered by Dr. Edwards. This *144 apparent dramatic drop in mental ability could have resulted from the onset of organic brain damage, the development of a psychosis, or malingering on defendant’s part. Defendant appeared incapable of making complex decisions, such as whether he should testify in his own behalf. When asked about defendant’s “mental age,” Dr. Edwards estimated that defendant was “performing at the level of a third grader at best, in my opinion, which would be like a nine or ten-year-old at best.” Dr. Edwards diagnosed defendant as suffering from “an atypical organic brain syndrome with possible dementia,” and “[sjchizophrenia, paranoid type chronic.”
On November 4,1986, defendant again complained of hearing voices, and his medication was increased to 60 milligrams per day. On November 7, 1986, defendant appeared more withdrawn. The dosage was increased again on November 18, 1986, to 70 milligrams per day. On May 19, 1987, the dosage was decreased to 50 milligrams per day due to the fear of irreversible side effects. On June 2, 1987, after defendant reported an increase in the volume and frequency of the voices, his dosage of Navane was increased to 60 milligrams per day. On June 12, 1987, it again was increased to 70 milligrams per day. Defendant appeared more spontaneous. Between January 1986, and the time of the second competency hearing (March 18, 1988), defendant improved slightly, began to address Nurse Rumsey by name, and would wave at her if he saw her in the hallway. Rumsey agreed that, since his return from Atascadero, defendant had been successfully maintained on medications, and that his mental condition was better than before he went to Atascadero.
Psychiatrist Dr. Marlene Mirassou, medical director of the psychiatric unit of the Sacramento County jail, examined defendant on October 1, 1987, to render a second opinion regarding defendant’s medication. Defendant’s daily dosage of Navane was 80 milligrams at that time. The psychiatrists working at the jail had agreed that if more than 60 milligrams per day was prescribed, an additional psychiatrist would review the case. Dr. Mirassou stated that the “usual therapeutic range” for Navane was “around sixty milligrams a day,” but she explained that this was “not an absolute upper limit.” “[I]n fact, Navane can be used in doses of over one hundred milligrams per day. But that is not usual.” Exceeding a dosage of 60 milligrams per day rarely increases the beneficial response. One reason Dr. Mirassou examined defendant was to see whether his was “one of the rare cases” in which a higher dose was appropriate. The possible side effects of Navane include “muscle spasms, muscle tics or twitches” and lowered blood pressure. “In terms of short-term side effects it is fairly safe. Even in large doses. It is extended doses that are of concern.” If a person who did not have a psychotic mental disorder took a daily dose of 60 milligrams of Navane, it is likely that person would be extremely sedated by it.
*145 Dr. Mirassou advised defendant that at his current dosage he might have more trouble with muscle twitches, but defendant related that when his medication was decreased he had “more difficulty with the voices.” Defendant indicated “he preferred the increased dose and the improved symptoms . . . .” According to defendant, “the positive effect of the medication was worth risking the possible side effects.” Dr. Mirassou added: “And when I saw Mr. Jones again two weeks later [on October 15, 1987] when a question about his ability to give consent had been brought up, we talked about it again, and he gave me the same general idea.” After spending a half hour with defendant, Dr. Mirassou felt that, given more time, defendant was capable of giving informed consent to taking the medication. Other possible side effects of Navane include weight gain, breast enlargement, and drowsiness.
Eugene Lockmiller testified that from January 1986 to July 1987, he was a guard on the day shift at the Sacramento County jail. Defendant was in a single cell and slept most of the time. He had a subscription to the Sacramento Bee, but Lockmiller never saw defendant read the newspaper. Defendant would grin in response to jokes and was able to understand and follow instructions, but was extremely slow.
As noted above, on October 13, 1987, defense attorney Morris filed a declaration pursuant to section 1368 expressing doubt as to defendant’s competency to stand trial. The superior court suspended proceedings and again appointed Dr. Kaldor to evaluate defendant’s competency.
Dr. Kaldor interviewed defendant on November 18, 1987. Defendant responded to Dr. Kaldor’s questions and gave accurate information concerning various topics, such as defendant’s age and where he had lived prior to his incarceration. Dr. Kaldor found a marked improvement in defendant’s condition compared to when he had examined defendant two years earlier. The psychiatrist was concerned that defendant was not as cooperative as he could be. Defendant stated that he heard voices every day, about 20 hours per day. The voices said they were going to kill him. Dr. Kaldor said: “I was impressed on how much he had improved as a result of his treatment at Atascadero.” Defendant knew he was charged with three murders and said it was: “Because I killed some people.”
Dr. Kaldor asked defendant about his defense to the current charges, and defendant indicated his attorney “is going to do an insanity thing. It means that I am crazy, I think. I didn’t know what I was doing. The voices told me to kill them.” Dr. Kaldor asked defendant “how he would explain his way out of these charges,” and defendant responded: “Tell them that I was *146 hearing voices at the time .... Tell them I was sick.” Dr. Kaldor was concerned whether defendant was malingering and concluded that defendant was schizophrenic but, nevertheless, was competent to stand trial.
Psychiatrist Dr. James Peal examined defendant and concluded that he was not competent to stand trial. Upon first examining defendant in 1985, Dr. Peal concluded: “He was, for the most part, mute. He was unable to respond to questions other than his name and other than the fact that he heard voices.” “My conclusion was that Mr. Jones had manifestations of. a major mental illness. He was responding to voices. The voices interfered with his ability to think and to hear or respond to what was being asked. He was preoccupied almost entirely with the voices and he was not able to tell me in any fashion what the voices were telling him except that they were telling him to kill. He was extremely frightened of the voices at that time.” Dr. Peal examined him several times after defendant returned from Atascadero, including in August 1987 and on March 2 and 6, 1988, finding that “the clinical picture didn’t change very much.”
Regarding whether defendant understood the charges, Dr. Peal stated: “Jeffrey Jones knows in a very specific concrete way that he is accused of a major crime in the sense that he can say, yes, I am accused of murder. In terms of real understanding what that means, I don’t think he has it.” Defendant told Dr. Peal that he had killed some people. Regarding defendant’s ability to testify: “My opinion is that his ability to testify is grossly impaired. It is impaired by his illness and it is impaired by the medication that he is on to treat or contain his illness. [<¡0 I found that he was unable to understand or comprehend questions. He could not pay attention long enough to hear the questions. He was preoccupied with hearing these voices so that he couldn’t understand the questions, and he responded to most of them usually with no response or with an I don’t know or I don’t remember. [*jQ He has difficulty with the medication that he is on and the amount even in focusing his attention on anything or staying awake.” Dr. Peal believed that defendant could not participate in his defense because he could not furnish information to his attorneys and does not understand “what this is all about.” Defendant’s “recent and remote” memory is “grossly impaired.” “The problem with his recent memory is that not only is he competing with his voices, but he is competing with the eighty milligrams of Navane that he is on which impairs his ability to perceive, a great deal of the time he is somnambulant. He’s sleeping. So he can’t take in what is going on if he is asleep.”
Dr. Peal concluded that defendant suffers from “schizophrenia, paranoid type.” In Dr. Peal’s view, schizophrenics cannot malinger and a person *147 cannot be schizophrenic and have an antisocial personality disorder. Dr. Peal does not believe defendant has an antisocial personality disorder, and does not believe defendant is a malingerer.
Psychologist Grant Hutchinson testified that defendant is a paranoid schizophrenic, but also “has a personality disorder of the antisocial type.” Dr. Hutchinson stated his belief that schizophrenics can exaggerate their symptoms, opining: “I feel at various times and on different occasions this defendant has malingered.”
At the time of the hearing on March 17, 1988, defendant was taking 90 milligrams of Navane daily. Regarding the circumstance that defendant slept much of the time, Dr. Mirassou stated: “Again, one of the problems in this particular setting is that the amount of stimulation, the amount of things to do available to the inmates is extremely low, especially in a single cell, and many people off of medication don’t do anything but sleep and eat.” As Dr. Mirassou later put it: “I never know whether it is the jail or the medication.”
On March 30, 1988, the jury found defendant competent to stand trial.
On July 13, 1988, at the conclusion of a hearing on pretrial motions, defense counsel made the following statement: “As the Court knows, the defense made a [Penal Code section] 1368 request and we had a ruling against us. Our position hasn’t changed with regard to our belief that we believe Mr. Jones lacks competency. And I simply want to put on the record now that he is sitting there with his eyes closed and appears to be sort of nodding off. And he is on heavy doses of medication that has a side effect of drowsiness. And I would simply like the record to reflect that at the present time for whatever value to the proceedings it is relevant.” The court responded: “All right. The record will so reflect.”
The guilt phase of the trial commenced with jury selection on July 18, 1988. The following day, during voir dire, defense counsel stated: “Before we have take [szc] a recess, I would like to put on the record that during the course of voir dire of Mr. Ames, Mr. Jones was sleepy, and my belief is he slept approximately about seventy percent of the particular voir dire. I simply would place that on the record for whatever purposes.” The court responded: “I would indicate to you that I caught your eye as well as when I was looking at him, I looked down at him and while he appeared to be asleep, at one point one eye opened and he looked around to see me and then immediately closed it and went back to sleeping. For what ever purpose that is. But yes, the record will so reflect.”
On July 20, 1988, defense counsel stated, “[j]ust for the record,” that defendant appeared to be sleeping during the entire voir dire of one juror. *148 The court responded: “All right. The record will reflect he has apparently had his eyes closed most of the time.” Defense counsel made a similar statement on July 26, 1988. On August 2, 1988, defense counsel stated during voir dire: “Today Jeffrey Jones seems to be incredibly more drowsy than any other time I have seen him, and he slept pretty much the entire morning.” The court responded: “The record will reflect for most of the morning he has had his eyes closed.” On August 9, 1988, defense counsel stated: “[T]his morning during the voir dire, Mr. Jones was, I believe, asleep for about fifteen minutes this morning. I ask the Court to put it on the record because I believe it has to do with the problem of him being overmedicated.”
On September 7, 1988, the tables turned somewhat. The prosecutor noted that “the last few days [defendant] has been at least sitting there with his eyes closed more often than not” and asked whether “it might be appropriate if we can give his jail doctors a call to see if there is a problem with his medications or can they vary them so he is a little more alert during his death penalty trial.” Defense counsel responded: “Absent the medication, the problems that Jeffrey Jones has is that the voices start getting louder. . . . [Tjhere are certain psychotic symptoms and signs that take place and he becomes a control problem. And while he has been on medication there hasn’t been a control problem at all. . . . [*][] It is just that I am not so sure that if there is a middle ground—they tried changing medications, I am aware of, and the other medication had a side effect that is far worse than the one he is on. [<][] I recognize the jail is doing the best they can, and, I mean, I will encourage any efforts to improve his condition, but my belief is the condition he is in right now is probably the best that we have got.” The trial court encouraged both defense counsel and the prosecutor to contact defendant’s physicians at the jail to ascertain whether defendant’s medications could be adjusted, stating that the court did not know “whether he is not sleeping at night and sleeping during the day,” and adding: “I noticed his head was nodding this morning.”
On September 22, 1988, at the close of the prosecution’s case in the guilt phase, the trial court remarked: “For the record, several times this afternoon [defense counsel] has been yawning.” Defense counsel rejoined: “Yes, but I didn’t fall asleep like my client who slept part of the morning and this afternoon.” On October 31, 1988, during the sanity phase, the court directed the bailiffs “to get Mr. Jones up and moving around so he can stay awake.” Defense counsel noted that defendant “apparently fell asleep,” to which the court responded: “His eyes were closed. Occasionally they open. How far asleep he was, I don’t know. But I want him to get up and move around.” Finally, on November 1, 1988, at the conclusion of a discussion of jury instructions for the sanity phase, the following colloquy occurred: “[Defense *149 Counsel]: I would just ask the record reflect during the time we have been discussing this Jeffrey Jones has been sitting there— [*][] The Court: Let the record reflect he again had his eyes closed. I cannot make a determination at the time whether he is asleep or just closing his eyes.”
An engrossed settled statement on appeal, issued by the trial court on June 26, 1992, stated that, during the guilt and penalty phases of the trial, “the Court was not watching defendant at all times.[6] When defendant’s counsel asked the Court to note for the record that defendant was asleep, this Court noticed that defendant was sitting erect with his eyes closed and so noted for the record. This Court does not recall any other instances in which defendant had his eyes closed during the proceedings. [*][] Based on the testimony of [defense counsel], this Court finds that there were one or more other occasions during the guilt phase of the trial, which were not brought to the Court’s attention and therefore not reflected in the record, where defendant was sitting erect with his eyes closed . . . .”
As noted above, defendant asserts he was denied due process of law because the trial court failed to conduct an additional competency hearing pursuant to section 1368 despite “substantial new evidence” suggesting that defendant “was daily being sedated into a veritable stupor” by the administration of antipsychotic drugs.
“A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.” (§ 1367, subd. (a).) To the same effect, the United States Supreme Court has held that “ ‘the criminal trial of an incompetent defendant violates due process.’ [Citations.] ...[*][] The test for incompetence is also well-settled. A defendant may not be put to trial unless he ‘ “has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him.” ’ [Citation.]” (Cooper v. Oklahoma (1996) 517 U.S._, _ [116 S.Ct. 1373, 1376-1377, 134 L.Ed.2d 498].)
“When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. *150 [Citation.] Evidence is ‘substantial’ if it raises a reasonable doubt about the defendant’s competence to stand trial. [Citation.] The court’s duty to conduct a competency hearing arises when such evidence is presented at any time ‘prior to judgment.’ [Citations.] [U When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it ‘is presented with a substantial change of circumstances or with new evidence’ casting a serious doubt on the validity of that finding. [Citations.]” (People v. Jones (1991) 53 Cal.3d 1115, 1152-1153 [282 Cal.Rptr. 465, 811 P.2d 757]; People v. Kelly (1992) 1 Cal.4th 495, 542 [3 Cal.Rptr.2d 677, 822 P.2d 385].)
Two competency hearings were held in the present case. The municipal court initiated the first hearing, which resulted in a suspension of the criminal prosecution and defendant’s transfer to Atascadero State Hospital. After it was determined that defendant had become competent to stand trial, and criminal proceedings had resumed, defense counsel informed the court he believed defendant was incompetent to stand trial. Defendant again was evaluated by mental health professionals, and a jury trial was held, following which the jury found defendant was competent to stand trial.
A primary issue at the competency trial was whether defendant was malingering by exaggerating the symptoms of his mental illness.[7] Evidence also was introduced establishing that defendant was taking large doses of medication, one side effect of which was sleepiness. Defense counsel argued to the jury that the drowsiness caused by the medication was sufficient alone to support a finding that defendant was incompetent to stand trial. The jury found that defendant was competent.
Following the second competency hearing, defense counsel periodically noted “for the record” that defendant appeared to be asleep, but did not request a third competency hearing, apparently concluding that defendant’s apparent drowsiness did not constitute substantial new evidence of incompetence. Defense counsel stated on the first occasion the issue was raised following the competency trial: “Our position hasn’t changed with regard to *151 our belief that we believe Mr. Jones lacks competency. And I simply want to put on the record now that he is sitting there with his eyes closed and appears to be sort of nodding off. And he is on heavy doses of medication that has a side effect of drowsiness. And I would simply like the record to reflect that at the present time for whatever value to the proceedings it is relevant.” The circumstance that defendant appeared sleepy or drowsy during court proceedings did not constitute “a substantial change of circumstances” or “new evidence” of incompetence necessitating a third competency hearing. (People v. Jones, supra, 53 Cal.3d 1115, 1153.)
Defendant asserts that because the judge who presided over the guilt, sanity, and penalty phases of the trial had not presided over either of the two competency hearings, that judge “had a duty to make an independent assessment” of defendant’s competence. Defendant cites no authority in support of this proposition, and we are aware of none. It is absurd to suggest that, following a jury trial at which it is determined that defendant is competent to stand trial, the assignment of another judge to conduct further proceedings, standing alone, necessitates relitigating the issue of defendant’s competence to stand trial.
It also appears that the judge who presided over the guilt, sanity, and penalty phases of the trial was not presented with substantial evidence of incompetence that would have necessitated a further hearing on defendant’s competence to stand trial. The judge made it clear that he could not determine whether defendant was sleeping or simply had closed his eyes, and the judge suspected that defendant may have been malingering by exaggerating the extent of his drowsiness. On one occasion when defense counsel raised this issue, the court remarked that while defendant had appeared to be asleep, “at one point one eye opened and he looked around to see me and then immediately closed it and went back to sleeping.” In the engrossed settled statement, the court stated it could not determine whether defendant was asleep or simply had his eyes closed, but was careful to note that defendant remained sitting erect when his eyes were closed. Based upon the record as a whole, the trial court did not err in failing to conduct a third competency hearing.

Administration of Antipsychotic Drugs

Relying upon the decision in Riggins v. Nevada (1992) 504 U.S. 127 [112 S.Ct. 1810, 118 L.Ed.2d 479], defendant contends he was denied due process of law because antipsychotic drugs were administered to him to control his schizophrenia during the course of the proceedings conducted in the present case. The defendant in Riggins was charged with murder and *152 robbery. While in jail, he told a psychiatrist he was hearing voices in his head, and the psychiatrist prescribed medication, including an antipsychotic drug. Prior to trial, the defense moved the court for an order suspending administration of the medications the defendant was taking. At a hearing on the motion, two psychiatrists testified that, without medication, defendant would remain competent to stand trial and his demeanor would not change noticeably. A third psychiatrist testified the medication made defendant calmer, but he could not predict how defendant would react if taken off the medication. A fourth psychiatrist testified defendant was incompetent to stand trial even while taking the medication, and predicted that, without medication, defendant’s condition would deteriorate. The trial court, without indicating its reasoning, denied the motion to suspend administration of the medication. (Id. at pp. 130-131 [112 S.Ct. at pp. 1812-1813].)
The United States Supreme Court held that involuntary administration of the antipsychotic drug denied the defendant due process of law, because the state failed “to establish the need for [the drug] and the medical appropriateness of the drug.” (Riggins v. Nevada, supra, 504 U.S. 127, 135 [112 S.Ct. 1810, 1815].) The high court observed: “Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins’ own safety or the safety of others. [Citations.] Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins’ guilt or innocence by using less intrusive means. [Citation.] The question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial is not before us.” (Id. at pp. 135-136 [112 S.Ct. at p. 1815].)
Unlike defense counsel in Riggins v. Nevada, supra, 504 U.S. 127, the defense in the present case did not move the trial court to suspend administration of defendant’s medication, or otherwise assert in the trial court that defendant was being medicated against his will. To the contrary, during selection of the guilt phase jury, defense counsel stated, regarding the administration of defendant’s medication by jail personnel: “I recognize the jail is doing the best they can, and, I mean, I will encourage any efforts to improve [defendant’s] condition, but my belief is the condition he is in right now is probably the best that we have got.” Defendant may not raise, for the first time on appeal, the claim that he was denied due process of law because antipsychotic drugs were administered to him to control his schizophrenia *153 during the proceedings in the present case. (People v. Lucas (1995) 12 Cal.4th 415, 477 [48 Cal.Rptr.2d 525, 907 P.2d 373].)
Even if we were to consider the merits of defendant’s contention, it is clear that the holding in Riggins v. Nevada, supra, 504 U.S. 127 does not apply in the present case, because defendant did not refuse the medication and was not forced to take the antipsychotic drug. Nothing in the decision in Riggins v. Nevada, supra, 504 U.S. 127, or in any other case of which we are aware, suggests that a competent criminal defendant’s voluntary ingestion of medication that has been provided by the state denies the defendant due process of law.
Defendant attempts to avoid this result by observing that in 1985, nearly three years prior to trial, he refused medication for a brief period and was medicated against his will. Defendant argues that, as a result, his subsequent compliance in taking medication must be deemed involuntary. The record before us does not support defendant’s argument.
From January 22, 1985, when defendant was transferred to the Sacramento County jail following his arrest, until March of that year, defendant refused medication for his mental illness. On March 10, 1985, the psychiatric staff at the jail had defendant transferred to the psychiatric unit of the jail for 72 hours of observation, because defendant had been pacing in his cell and appeared agitated. Defendant was involuntarily medicated with the antipsychotic drug Haldol but, when returned to a regular cell, refused further medication. Defendant remained unmedicated until July 15, 1985, when he again became agitated, yelling threats, disrobing and standing nude in his cell, and inducing vomiting and spreading the vomitus on the walls. Defendant again was transferred to the psychiatric unit and involuntarily medicated with Haldol. After 14 days, defendant was returned to the regular jail population and agreed to continue his medication voluntarily. To decrease side effects, his medication was changed to the antipsychotic drug Thorazine Prolixin.
Defendant accepted his medication until April 12, 1988, when his medication was changed to the antipsychotic drug Prolixin and defendant developed diarrhea. Defendant stopped taking the Prolixin, because he concluded it was causing the diarrhea, and asked to be given Navane. On May 13, 1988, defendant’s medication was changed to Loxitane, and he resumed taking his medication.
As the foregoing illustrates, defendant’s assertion that he “persistently refused being medicated with antipsychotic drugs” is not supported by the *154 record. Defendant refused medication only during the first six months following his arrest. During this period, jail officials forcibly medicated him only when it appeared he had become a danger to himself or others. After the first occasion when defendant was medicated forcibly, in May 1985, he refused to continue his medication voluntarily and thereafter was not medicated for several months, until it again appeared he had become a danger to himself or others. After he was medicated forcibly a second time, defendant consented to continue his medication and did so for several years, until April 1988, when he concluded that a change in his medication was causing an unpleasant side effect. Defendant thus demonstrated on two occasions his ability to discontinue his medication. It does not appear, as defendant asserts, that his ingestion of antipsychotic drugs rendered him incapable of refusing such medication. It also is significant that, following his April 1988 refusal to accept medication, he consented to resume treatment when his medication was changed at his request. Defendant thus consented to resume taking antipsychotic drugs, prior to the guilt, sanity, and penalty phases of his trial, at a time when he was unmedicated.
Following his initial refusal to accept medication, it appears without contradiction that defendant willingly accepted his medication. While confined in Atascadero State Hospital in late 1985, defendant told Dr. Harold Carmel, a staff psychiatrist, that he needed his medications to stay competent. On October 1, 1987, psychiatrist Dr. Marlene Mirassou, medical director of the psychiatric unit of the Sacramento County jail, examined defendant for the purpose of rendering a second opinion regarding defendant’s medication. Defendant was ingesting 80 milligrams of Navane per day. Dr. Mirassou advised defendant that, at his current dosage, he might have more trouble with side effects such as muscle twitches, but defendant related that when his medication was decreased he had “more difficulty with the voices.” Defendant indicated “he preferred the increased dose and the improved symptoms,” indicating that “the positive effect of the medication was worth risking the possible side effects.” Dr. Mirassou added: “And when I saw Mr. Jones again two weeks later ... we talked about it again, and he gave me the same general idea.” A. member of the jail psychiatric staff reported that on August 10, 1988, defendant told her “that with the medications the voices are there but they are not as bothersome to him.” Dr. James Peal, a psychiatrist retained by the defense, examined defendant and testified on defendant’s behalf during the competency trial, describing defendant as being “very insistent upon taking his medication” because it lessens the voices he hears in his head. Accordingly, we have no basis upon which to conclude that defendant was medicated involuntarily with antipsychotic drugs.
Defendant contends the state bore the burden of proving that defendant gave informed consent to being medicated with antipsychotic drugs. Assuming for the purpose of argument that a person who has not been judicially *155 determined to be incompetent must furnish informed consent before being treated with antipsychotic drugs (cf. Riese v. St. Mary’s Hospital & Medical Center, supra, 209 Cal.App.3d 1303, 1320), and assuming further that the state would bear the burden of proving such informed consent in the event the administration of such drugs were challenged, the state bore no such burden in the present case, because defendant did not raise the issue in the trial court.
Defendant asserts that the court in Riggins v. Nevada, supra, 504 U.S. 127 held “that the State may not prosecute a capital defendant who is being medicated with antipsychotic drugs while in its custody, and under color of State authority, without first formally justifying the continued drugging of that defendant during his trial.” The holding in Riggins was not nearly so broad. Riggins simply held that “once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.” (Riggins v. Nevada, supra, 504 U.S. 127, 135 [112 S.Ct. 1810, 1815].) Defendant cites no authority, and we are aware of none, that would require the state to demonstrate, sua sponte, that a criminal defendant has furnished informed consent for any antipsychotic medications provided by the state.
Defendant contends he was denied due process of law because the state did not accord him the “substantive and procedural protections” guaranteed by the decisions in Washington v. Harper, supra, 494 U.S. 210 and Riggins v. Nevada, supra, 504 U.S. 127. Washington v. Harper, supra, 494 U.S. 210, 227 [110 S.Ct. 1028, 1039-1040], held that a mentally ill prisoner may be medicated against his will with antipsychotic drugs “if the inmate is dangerous to himself or others and the treatment is in the inmate’s medical interest.” If the inmate refuses such treatment, the state must provide “procedural protections ... to ensure that the decision to medicate an inmate against his will is neither arbitrary nor erroneous under the standards” discussed above. (Id. at p. 228 [110 S.Ct. at p. 1040].) Riggins v. Nevada, supra, 504 U.S. 127, 135 [112 S.Ct. 1810, 1815], held that the rule announced in Harper applies to pretrial detainees. (Cf. Riese v. St. Mary’s Hospital & Medical Center, supra, 209 Cal.App.3d 1303, 1308 [patients involuntarily committed to mental health facilities must furnish informed consent to the administration of antipsychotic drugs].)
Neither Harper nor Riggins held that the procedural protections discussed in those decisions were required when a prisoner or detainee consents to the administration of antipsychotic drugs. The opinion in Harper notes that the defendant initially consented to the administration of antipsychotic drugs. It was only when the defendant later refused to continue the medication, and *156 the state sought to continue the medication over his objections, that the treatment became involuntary and a hearing was required. (Washington v. Harper, supra, 494 U.S. 210, 213-215 [110 S.Ct. at 1028, 1032-1033].) Similarly, the defendant in Riggins initially consented to take an antipsychotic drug, but later moved the trial court to suspend administration of the drug. The United States Supreme Court agreed that “once the District Court denied Riggins’ motion to terminate use of Mellaril, subsequent administration of the drug was involuntary.” (Riggins v. Nevada, supra, 504 U.S. 127, 133 [112 S.Ct. 1810, 1814].) Unlike Harper and Riggins, the present case does not involve a defendant who refused his medication, or moved the court to cease his medication, during the guilt, sanity or penalty phases of his trial. When defendant earlier refused his medication, administration of the medication ceased. When defendant refused his medication in 1988, just prior to the guilt phase of his trial, it was changed at his request and was resumed only once he had consented.
For all of the foregoing reasons, it does not appear that defendant was denied due process of law under the decision in Riggins v. Nevada, supra, 504 U.S. 127. For those same reasons, we reject as well defendant’s cursory arguments that his ingestion of antipsychotic drugs denied him his rights, under the Eighth and Fourteenth Amendments to the United States Constitution, to an individualized and reliable sentencing determination.
Defendant further argues that, even if he voluntarily ingested antipsychotic drugs, “his rights to effective assistance of counsel, to present evidence, to testify, to confront witnesses, to due process, to a fair trial, and to a reliable sentencing determination, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, were all violated.” Defendant reasons that if a criminal defendant is being administered medication to control a mental illness, “and that medication substantially-interferes with his ability to exercise his constitutionally guaranteed trial rights, the Due Process Clause requires that the State not try that individual while he remains substantially impaired by that medication . . . .” In essence, defendant is arguing that the medication prescribed for him rendered him incompetent to stand trial. As discussed in the previous part of this opinion, a full competency hearing was conducted, after which the jury concluded to the contrary that defendant was competent to stand trial, despite the effects of the medication he was taking. That finding is supported by substantial evidence. We conclude, therefore, that defendant’s voluntary ingestion of antipsychotic drugs during his trial does not warrant reversal of the resulting judgment.

Mental Presence at Trial

Defendant asserts the judgment must be reversed because he was denied his right to be mentally “present” at trial, as guaranteed by section *157 1043,[8] in that “his mental alertness during trial was severely impaired by a combination of physical stress, mental stress, and the physical and mental effects of having been administered antipsychotic drugs.” Defendant contends the trial court was required to suspend the trial or, at the least, to conduct a hearing to determine whether defendant was mentally “present.”
Section 1043, subdivision (a), provides: “Except as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.” None of the statutory exceptions listed in section 1043 apply in the present case. This court held in In re Dennis (1959) 51 Cal.2d 666, 672 [335 P.2d 657] that the only reasonable interpretation of the “ ‘requirement that a defendant be present at every stage of a felony prosecution is that the accused person must be both physically and mentally present.’ ” (Quoting People v. Berlins (1953) 115 Cal.App.2d 255, 267 [251 P.2d 1017].)
In the case before us, the question whether the medication administered to defendant rendered him incapable of understanding, and participating in, the court proceedings had been examined in great detail during the competency trial. As noted above, the jury at that trial heard evidence establishing that the medication administered to defendant caused drowsiness, but it also heard evidence suggesting that defendant was malingering. A criminal defendant is incompetent to stand trial “if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.” (§ 1367, subd. (a).) In finding that defendant was competent to stand trial, therefore, the jury necessarily determined that defendant was able to understand the criminal proceedings despite the effects of his medication.
Although this determination was made prior to trial, defendant does not point to anything in the record indicating that his mental state substantially worsened during the trial. Approximately six weeks after the jury found defendant competent to stand trial, defense counsel noted for the record, “for whatever value to the proceedings it is relevant,” that defendant had his eyes closed and appeared to be “sort of nodding off,” but defense counsel did not request a third competency hearing, apparently concluding that defendant’s apparent drowsiness did not constitute substantial new evidence of incompetence. Approximately six months after the jury found defendant competent to stand trial, defense counsel stated the belief that “the condition [defendant] is in right now is probably the best that we have got.”
Defendant argues that a defendant may be competent under the foregoing definition, but may be denied his right to be mentally “present” at trial if the *158 defendant’s mental state is impaired “for any reason other than that he is suffering from a ‘mental disorder or developmental disability.’ ” Assuming arguendo that defendant is correct in this assertion, the present case does not involve such circumstances. Although defendant asserts that his mental alertness was “severely impaired by a combination of physical stress, mental stress, and the physical and mental effects of having been administered antipsychotic drugs,” he fails to demonstrate that he was under physical or mental stress, or that his mental alertness was impaired by such stress.
The record before us does not establish that defendant’s alleged lack of alertness during the trial proceedings was real rather than feigned. We do not know whether, or to what extent, defendant slept during court proceedings. The record reflects that defendant was sitting erect with his eyes closed on some occasions and, on one or two occasions, his head was nodding. The trial judge questioned whether defendant’s conduct was deliberate. In light of the jury’s determination that defendant was competent to stand trial, and the absence of any evidence suggesting that defendant’s condition had worsened during the proceedings, the record does not support defendant’s claim that he was denied his right to be mentally “present” at the trial.

Burden of Proof of Incompetence

Section 1369, subdivision (f), provides that, at a trial conducted for the purpose of determining a defendant’s competence to stand trial: “It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent.” In People v. Medina (1990) 51 Cal.3d 870, 885 [274 Cal.Rptr. 849, 799 P.2d 1282], we held “that section 1369 passes constitutional muster under both the federal and state Constitutions.” In Medina v. California (1992) 505 U.S. 437, 452-453 [112 S.Ct. 2572, 2580-2582, 120 L.Ed.2d 353], the United States Supreme Court upheld this court’s ruling that section 1369 does not violate the due process clause of the federal Constitution. (Cf. Cooper v. Oklahoma, supra, 517 U.S. _, _ [116 S.Ct. 1373, 1383-1384, 134 L.Ed.2d 498, 515] [a requirement that a criminal defendant prove his incompetence by clear and convincing evidence violates the due process clause of the federal Constitution].)
Defendant acknowledges that placing upon the defendant in a competency hearing the burden of proving his or her incompetence does not violate the California or federal Constitutions, but he contends that this rule “must be limited to the situation in which the accused is not being involuntarily medicated with antipsychotic drugs during his competency trial.”
We need not, and do not, determine whether it would be improper to place upon a defendant who is being involuntarily medicated with antipsychotic *159 drugs the burden of proving his or her competence because, as discussed above, the record before us affords no basis upon which to conclude that defendant was medicated involuntarily with antipsychotic drugs.

Wheeler Motion

We held in People v. Wheeler (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748] “that the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.” In Batson v. Kentucky (1986) 476 U.S. 79, 96 [106 S.Ct. 1712, 1722-1723, 90 L.Ed.2d 69], the United States Supreme Court held that a prosecutor’s use of peremptory challenges to excuse prospective jurors “on account of their race” may violate the equal protection clause of the Fourteenth Amendment to the federal Constitution. (See also J.E.B. v. Alabama ex rel. T.B. (1994) 511 U.S. 127, 128-129 [114 S.Ct. 1419, 1421-1422, 128 L.Ed.2d 89, 97] [peremptory challenges may not be exercised on the basis of gender].)
“A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing of strong likelihood that the opponent has excluded one or more jurors on the basis of group or racial identity. The burden then shifts to the opponent to show that he or she had genuine nondiscriminatory reasons for the challenges at issue. [Citations.]” (People v. Montiel (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)
In the present case, defendant, who is African-American, moved to quash the jury panel and begin jury selection anew after the prosecutor exercised peremptory challenges against all three African-American prospective jurors, defendant noting for the record that the final panel was composed entirely of Caucasians.[9] The court responded that the district attorney should state for the record his reasons for exercising those preemptory challenges. The People concede that, by asking the prosecutor to state his reasons for exercising those peremptory challenges, “the trial court at least implicitly determined that appellant made a prima facie showing” that the three *160 African-American prospective jurors were excluded on the basis of group bias.[10]
The prosecutor explained that when the court asked prospective juror Judith Credic whether she could vote to impose the death penalty, she paused three to five seconds and then answered, “I don’t know.” By contrast, when asked whether she could vote to impose life imprisonment without the possibility of parole, she very quickly responded, “Yes.” The prosecutor further noted that Credic had a friend who was accused of an aggravated assault and that she expressed hesitation about sitting in judgment of others, particularly if the case involved the death penalty.
As to prospective juror Donald Haynes, the prosecutor pointed out that both of Haynes’s brothers had been arrested and prosecuted, and one had been convicted of murder. When asked whether he could vote to impose the death penalty, Haynes paused for a long time and then replied, “I think I could.” The prosecutor also observed that Haynes was one of two male jurors who carried a purse.
The prosecutor indicated it had been difficult to decide whether to challenge prospective juror Audrey Parker, because it was “an elimination process” between her and prospective jurors Joanne Blanchette and Donald McKenzie, two Caucasians who remained on the final jury panel. The prosecutor’s main objection to Parker was that she said she would favor a sentence of life in prison without the possibility of parole if there was evidence of insanity. The prosecutor stated: “That was my primary reason, because I felt that she would cut him slack. None of these other jurors indicated they would cut or favor life without possibility of parole if there was a mental problem, and that is the guts and essence of the defense case here.”
The trial court denied the motion, stating, without elaboration, that it found “no Wheeler violation based upon the explanation the District Attorney has given as to each and every one of the three jurors.” On appeal, defendant does not dispute the trial court’s findings regarding the peremptory challenges to prospective jurors Credic and Haynes, but argues we must conclude that the prosecutor improperly challenged prospective juror Parker on the basis of her race because the prosecutor misrepresented the record of voir dire in explaining why he had Parker excused from the *161 jury, and because two Caucasian venirepersons who were selected to serve on the jury gave answers during voir dire that were substantially similar to the answers given by Parker.
Defendant maintains that the prosecutor misstated the record when he asserted that Parker was the only prospective juror who indicated that she would favor a sentence of life in prison without the possibility of parole if there was evidence defendant had a “mental problem.” The record before us does not support defendant’s characterization of the prosecutor’s statement. The prosecutor did not assert, as defendant claims, that Parker was the only prospective juror expressing this view, but stated instead that in comparing Parker with prospective jurors Blanchette and McKenzie, only Parker had said she would “favor life without possibility of parole if there was a mental problem.”[11]
Parker stated during voir dire that she believed the death penalty was warranted in cases of multiple killings or random killings of innocent people “[i]f there is no insanity.” The defense attorney explained the penalty phase of the case would occur only in the event the jury found defendant legally sane. He then asked, “now even though you as a juror rejected the idea that the person was insane, would you still be listening, willing to listen to evidence with regard to the person’s mental problems and any mental disease or defect in the penalty phase of the case that is to determine whether or not in your own mind that would mitigate the nature of the crimes,” to which Ms. Parker responded that she would.
Blanchette’s views were considerably different. Regarding the death penalty, she stated: “Well, I just think that there are some cases that where a person is so mentally disturbed that maybe nothing will be able to enable him to lead a normal life or go back into normal situations besides prison. And in that case maybe it would be wise for the death penalty.” Blanchette later clarified her answer: “I think what I meant to say was that I think the death penalty should be applied only to people who are not mentally ill and who have, you know, premeditated killing and gone out and done it, whereas someone who is mentally ill is really not responsible for what he does.” When questioned by the prosecutor, Blanchette stated she “would have to be convinced that the person—I guess was not insane—was sane and committed the murder deliberately.” When the prosecutor explained that the penalty phase of the case would occur only in the event the jury found defendant legally sane, she replied: “Okay. If you found him sane, then I would probably say, yes, the death penalty.” Thus, the record appears to support the *162 prosecutor’s statement that, as between the two jurors, only Parker indicated she would favor a sentence of life imprisonment without the possibility of parole if there was evidence defendant had a “mental problem.”
Defendant contends that Parker’s answers on voir dire also were “identical” to those of Ronald Sunberg and Robert Cartwright, two Caucasian men selected for the jury. Defendant concludes that a comparison of the views expressed by Blanchette, Sunberg, and Cartwright with those expressed by Parker compels the conclusion that the prosecutor’s stated reasons for having Parker excused were “disingenuous.” We repeatedly have declined to engage in such comparisons. As we explained in People v. Johnson (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047], “the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention of another juror which on paper appears to be substantially similar.” We reiterated this point in People v. Montiel, supra, 5 Cal.4th 877, 909: “If the trial court makes a ‘sincere and reasoned effort’ to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court’s credibility determinations and would discount ‘”the variety of [subjective] factors and considerations,” ’ including ‘prospective jurors’ body language or manner of answering questions,’ which legitimately inform a trial lawyer’s decision to exercise peremptory challenges. [Citations.]”[12]
As the United States Supreme Court has observed: “Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding ‘largely will turn on evaluation of credibility.’ 476 U.S., at 98, n. 21. In the typical peremptory challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within a trial judge’s province.’ [Citations.]” (Hernandez v. New York (1991) 500 U.S. 352, 365 [11 S.Ct. 1859, 1869, 114 L.Ed.2d 395].)
Even if we were to engage in a comparative analysis of the responses given by the prospective jurors, defendant would not prevail. The *163 above quoted excerpts from the voir dire of prospective jurors Parker and Blanchette demonstrate that the prosecutor had a reasonable basis for concluding that Blanchette might have been more likely than Parker to vote for the death penalty in the present case. Similarly, prospective juror Sunberg stated that he felt the death penalty was appropriate for “a person of sound mind and body . . . that knows exactly what he is doing and kills somebody cold blooded, that is the worst kind of killing there is,” but he did not rule out the death penalty in other situations, stating he “just got to go with the details.” Sunberg later added that life in prison without the possibility of parole would be appropriate “[i]f a person kills by reason of insanity and is a threat to the life of others.” He clarified that such a sentence would be appropriate if the defendant “didn’t know what the hell he was doing.” Prospective juror Cartwright stated the death penalty would be appropriate if a person killed deliberately, and acknowledged “that a person that is mentally ill is not necessarily capable of reasonably thinking about what he is doing.” Like Blanchette, neither Sunberg nor Cartwright stated he would consider mental illness not amounting to insanity as a mitigating factor in considering whether to impose the death penalty. On this record, the trial court properly could find that the reasons advanced by the prosecutor for exercising a peremptory challenge against Parker were not mere pretexts intended to conceal a motive of racial bias.[13]

Excusing Prospective Jurors for Cause

Defendant contends the trial court erred in excusing for cause prospective jurors Betty Melvin and Ronald Beeler on the ground that they indicated on voir dire they would be unable to vote to impose the death penalty. We conclude the trial court did not so err.
In Witherspoon v. Illinois (1968) 391 U.S. 510, 512 [88 S.Ct. 1770, 1772, 20 L.Ed.2d 776], the United States Supreme Court invalidated a statute that *164 authorized a challenge for cause against any prospective juror in a capital case who expressed “ ‘conscientious scruples against capital punishment, or that he is opposed to the same.’ ” In Wainwright v. Witt (1985) 469 U.S. 412, 434-435 [105 S.Ct. 844, 857-858, 83 L.Ed.2d 841], the high court upheld the challenge for cause to a prospective juror in a capital case who stated that her personal beliefs against the death penalty would interfere with judging the guilt or innocence of the defendant. The court held that the standard for determining whether such a challenge for cause is proper is “whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” (Id. at p. 424 [105 S.Ct. at p. 852], fn. omitted.) The court observed that “this standard . . . does not require that a juror’s bias be proved with ‘unmistakable clarity’ ” (ibid.), noting that “[d]espite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial, judge who sees and hears the juror.” (Id. at pp. 425-426 [105 S.Ct. at pp. 852-853].)
Applying the above standard, we stated in People v. Fudge (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36]: “In many cases, a prospective juror’s responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror’s probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court’s evaluation of a prospective juror’s state of mind, and such evaluation is binding on appellate courts. [Citations.]”
During voir dire in the present case, the trial court recited a portion of the jury instruction regarding the consideration of aggravating and mitigating circumstances in determining whether to impose the death penalty, and asked prospective juror Melvin whether she “could vote for the death penalty” if she “felt that the penalty was appropriate.” Melvin answered: “I don’t know whether I could or not. I don’t feel that I would have the right to do that.” After indicating she believed that only God has “the right to life and death,” the court asked Melvin whether she could vote to impose the death penalty, and she answered: “I don’t think I could. I really don’t.”
Defense counsel then questioned Melvin at some length regarding whether she could consider voting to impose the death penalty. Near the end of this portion of the voir dire, Melvin stated: “I know what you are trying to get me to say, but I just, I don’t feel in my heart that I would be qualified. I am only *165 a person, not God, and I don’t want to be able to say, well, he could live or die no matter what had happened, what he did.”
Upon being questioned by the prosecutor, Melvin stated that, given a choice between the death penalty and life in prison without parole, she always would choose life in prison. Over defendant’s objection, the trial court granted the prosecutor’s challenge for cause to Melvin.
Prospective juror Beeler told the court that, because of his religious convictions, he could not, under any circumstances, vote to impose the death penalty. Upon being questioned by defense counsel, however, Beeler indicated that “in the case of Charles Manson” or “Jimmie Jones” he might be persuaded to vote for the death penalty. Beeler also stated he could follow the law regarding the death penalty.
When the prosecutor asked whether Beeler’s “ability to sit on a death penalty case would be impaired from the standpoint of being able to return a death verdict in an appropriate case,” Beeler answered: “I think that states it clearly. It would be impaired. It wouldn’t be impossible, but it would be strongly impaired.” After substantial additional questioning by the court and both parties, Beeler stated that he would vote for the death penalty only “[ujnder great duress,” explaining that he “would lean strongly toward life without the possibility of parole over the death penalty.” Over defendant’s objection, the court granted the prosecutor’s challenge for cause to Beeler.
Under the foregoing standards, the trial court did not err in excusing for cause prospective jurors Melvin and Beeler. Both Melvin and Beeler repeatedly indicated that their beliefs against the death penalty would prevent or substantially impair them from determining whether the death penalty should be imposed in the present case.

Separate Penalty Jury

Prior to trial, the trial court denied defendant’s motion for a separate jury for the penalty phase of the trial, should a penalty phase become necessary. Defendant argues on appeal that he was denied his right to an impartial jury during the penalty phase, because the jury that had found him guilty during the guilt phase could not be impartial during the penalty phase, and because, during the sanity phase of the trial, the jury was exposed to evidence of defendant’s antisocial conduct that was inadmissible as evidence in aggravation at the penalty phase. We have considered and rejected similar claims on several occasions. (People v. Bacigalupo (1991) 1 Cal.4th 103, 135-136 [2 Cal.Rptr.2d 335, 820 P.2d 559]; People v. Ashmus (1991) 54 Cal.3d 932, *166 956-957 [2 Cal.Rptr.2d 112, 820 P.2d 214]; People v. Fields (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680].)
Defendant relies upon the holding in Leonard v. United States (1964) 378 U.S. 544 [84 S.Ct. 1696, 12 L.Ed.2d 1028] that prospective jurors who heard a guilty verdict rendered against the defendant should have been disqualified to sit as jurors in an unrelated prosecution of similar charges against that defendant. The decision in Leonard obviously is distinguishable from the present case. A panel of prospective jurors that hears a verdict of guilty rendered in an unrelated case has received evidence of an uncharged crime that could result in substantial prejudice. (See People v. Ewoldt (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757].) In the present case, the jury did not learn of a verdict rendered in another case, but simply returned a verdict of guilty in the present case. Without a determination that defendant was guilty, neither a sanity nor a penalty phase would be possible or necessary. It cannot plausibly be asserted that knowledge that the defendant has been found guilty of the charged offense disqualifies the jury from considering the appropriate penalty for that offense.
As noted, defendant further contends that he was entitled to a separate jury for the penalty phase because, during the sanity phase, the jury heard evidence of defendant’s antisocial behavior that would have been inadmissible during the penalty phase. Defendant does not specify, however, what evidence, if any, introduced during the sanity phase would have been inadmissible during the penalty phase, stating only that defendant’s “antisocial behavior would not be admissible as an aggravating circumstance under Penal Code section 190.3(a)-(c),” which concerns the admissibility of .evidence of prior criminal conduct.[14] Contrary to defendant’s contention, it appears that the evidence of defendant’s antisocial conduct admitted during the sanity phase would have been admissible during the penalty phase pursuant to section 190.3, factor (h), which allows the jury to consider during the penalty phase “[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect. . . .”
The evidence of defendant’s antisocial conduct to which defendant apparently refers was admitted during the sanity phase to rebut defendant’s claim *167 that he was not guilty by reason of insanity due to the effect of his schizophrenia. The prosecution, in countering that defendant was exaggerating the effects of his illness, presented evidence of defendant’s antisocial conduct to demonstrate that his crime was a result of his antisocial personality rather than his schizophrenia. It appears that this evidence would have been admissible at the penalty phase for the same purpose.
Even if evidence was admitted during the sanity phase that would have been inadmissible during the penalty phase, defendant’s proper remedy was to request a limiting instruction directing the jury to disregard such evidence during the penalty phase. In People v. Fields, supra, 35 Cal.3d 329, 351-352, we recognized that important interests were served by having a single jury consider the defendant’s guilt of a capital offense and the appropriate penalty. Because the penalty jury must consider the circumstances of the crime, having a separate penalty phase jury would necessitate repeating a substantial portion of the evidence introduced during the guilt phase. “In this context, moreover, the preference for a single jury goes well beyond considerations of administrative convenience or expense and reflects a legitimate attempt to assure—insofar as possible—that the decision-making process of a death penalty case is a coherent whole. The preference for a single jury is by no means a one-sided matter; such a procedure may provide distinct benefits for both the prosecution and the defense. . . . From defendant’s perspective, the use of a single jury may help insure that the ultimate decision-maker in capital cases acts with full recognition of the gravity of its responsibility throughout both phases of the trial and will also guarantee that the penalty phase jury is aware of lingering doubts that may have survived the guilt phase deliberations. [Citation.] Thus, there are a number of weighty considerations to support the statutory preference for a single jury in capital cases.” (Id. at p. 352.) Defendant was not entitled to a separate jury during the penalty phase.

Prosecutorial Misconduct

Guilt Phase

Defendant contends the prosecutor committed numerous acts of misconduct during the guilt, sanity, and penalty phases of the trial.
During his argument at the close of the guilt phase, defense counsel asserted that the prosecution had failed to prove that the perpetrator of the alleged offenses acted with intent to kill, because there was no apparent motive for the attacks. Defense counsel stated: “Right now as all of you are sitting here not one of you knows why any of those people were killed. That *168 is a failure of proof with regard to the prosecutor.” The prosecutor objected and asked that the jury be instructed that motive is not an element of the crime, adding that defense counsel “knows he’s lying to this jury.” The court instructed the jury that motive is not an element of the crime, at which point defense counsel asked that the prosecutor be admonished for accusing defense counsel of being a liar. The court instructed the jury “to disregard what all the attorneys are saying now, only to consider what they are say [sic] during their arguments.” At the close of defense counsel’s argument, the court, outside the presence of the jury and at defense counsel’s request, ordered the prosecutor to “refrain from calling the others liars during arguments.”
The prosecutor, in his closing argument, referred to defense counsel’s argument that the prosecutor had failed to prove a motive for the crimes, stating: “Now I don’t think that Mr. Morris was deliberately trying to mislead you, but, let’s face it, folks he wasn’t being ultimately candid with you in what the law really does require. And that is too bad. It damaged his credibility, that comment.” Defense counsel objected that the prosecutor’s argument misstated the evidence, and the court stated: “That’s not proper argument.” In response to defense counsel’s request for “an admonition,” the court stated: “The jury is admonished to disregard any personal comments made by either side” and added the directive, apparently aimed at the prosecutor, to “[sjtick to the facts.”[15]
It was improper for the prosecutor to accuse opposing counsel of lying to the jury and to state that defense counsel’s credibility was damaged because he was not candid with the jury (People v. Cummings (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1]), but the trial court sustained defendant’s objections and, on both occasions, instructed the jury to disregard the comments. We assume the jury followed this instruction, and that any prejudice thus was avoided. (People v. Wash (1993) 6 Cal.4th 215, 263 [24 Cal.Rptr.2d 421, 861 P.2d 1107].)

Sanity Phase

Defendant contends the prosecutor committed misconduct under the holdings in Wainwright v. Greenfield (1986) 474 U.S. 284 [106 S.Ct. 634, 88 L.Ed.2d 623], Doyle v. Ohio (1976) 426 U.S. 610 [96 S.Ct. 2240, 49 L.Ed.2d 91], and Griffin v. California (1965) 380 U.S. 609 [85 S.Ct. 1229, 14 *169 L.Ed.2d 106], by eliciting from defense witnesses on cross-examination testimony indicating that defendant had stated to jail personnel that he would not speak to them on advice of his attorney.
During the sanity phase of the trial, defendant called as a witness Dr. Audrey Mertz, a psychiatrist at the Sacramento County jail, who treated defendant following his arrest. Dr. Mertz testified that when defendant was booked into the jail on January 23, 1985, the jail guards requested a psychiatric evaluation of defendant because he was slow to respond to the booking process and would not speak. During his first few months in jail, defendant continued to be uncommunicative and withdrawn and engaged in bizarre behavior, causing Dr. Mertz to diagnose defendant as suffering from chronic undifferentiated schizophrenia.
In an attempt to demonstrate that defendant was malingering by exaggerating his illness, the prosecutor elicited from Dr. Mertz on cross-examination testimony indicating that jail personnel suspected defendant was malingering because he appeared more relaxed and talkative when members of the psychiatric staff were not present. The following colloquy then occurred:
“[The Prosecutor]: Now you knew, of course, that from day one on January 23rd, 1985, when your jail psychiatric staff first wanted to see Mr. Jones, that he essentially told them in no uncertain terms that he did not want to talk with them?
“[Dr. Mertz]: Yes.
“Q. And, in fact, that is documented in your nursing reports; isn’t it?
“A. Yes.
“Q. And, in fact, he says specifically, ‘I’m not going to answer your questions and I am simply not going to talk to you people;’ right?
“A. Yes.
“Q. And he continued that for a long period of time; didn’t he?
“A. Yes, sir.”
Over defendant’s objection, the prosecutor then was permitted to ask the following questions:
“[The Prosecutor]: Doctor Mertz, as of January 23rd, 1985, the day after the defendant was arrested, he was approached by a nurse by the name of Peterson who worked in the jail psychiatric services; is that true?
*170 “A. Yes.
“Q. And on January 23rd, 1985, didn’t Mr. Jones tell Ms. Peterson that, T am not going to talk to you. My lawyers told me not to talk to you and I’m not going to answer any of your questions’?
“A. That is the note she wrote.”
The prosecutor also asked psychiatric nurse Gillian Rumsey on cross-examination whether she knew that defendant had stated on the day after his arrest that his lawyer had told him not to answer questions. Nurse Rumsey said she was aware of that statement and agreed that she had no way of knowing whether defendant had been unwilling or unable to communicate with her.
On cross-examination of psychiatrist Dr. Captane Thomson regarding whether defendant was malingering, the following occurred:
“[The Prosecutor]: Doctor, on the subject of the defendant’s elective muteness after his arrest, that was his conscious choice not to talk to people; wasn’t it?
“A. It was a conscious choice, yes.
“Q. And, in fact, on January 23rd of 1985, he made it very, very clear that he was not going to talk to anybody while he was in jail on the advice of counsel; isn’t that true?
“A. Yes.”
The United States Supreme Court, in Griffin v. California, supra, 380 U.S. 609, held that the Fifth Amendment privilege against self-incrimination forbids the prosecution from arguing, and the court from instructing the jury, that a defendant’s failure to testify is evidence of the defendant’s guilt. Doyle v. Ohio, supra, 426 U.S. 610, held that a defendant’s silence following the giving of Miranda warnings[16] could not be used to impeach the defendant’s testimony at trial. The high court held: “Silence in the wake of these warnings may be nothing more than the arrestee’s exercise of these Miranda rights. . . . Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.” (426 U.S. at pp. 617-618 *171 [96 S.Ct. at pp. 2244-2245].) In Wainwright v. Greenfield, supra, 474 U.S. 284, the high court held that the prosecution could not attempt to disprove the defendant’s claim that he was insane at the time of the alleged offense by introducing evidence that the defendant, following his arrest, understood the Miranda warnings and invoked his rights to remain silent and obtain counsel. The high court stated: “The point of the Doyle holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant’s plea of insanity. In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the State then seeks to make use of the defendant’s exercise of those rights in obtaining his conviction.” (Id. at p. 292 [106 S.Ct. at p. 639].)
The People, citing Fletcher v. Weir (1982) 455 U.S. 603, 607 [102 S.Ct. 1309, 1312, 71 L.Ed.2d 490], contend that defendant has failed to demonstrate that the holdings in Doyle and Greenfield apply in the present case, because he has not established that he was given Miranda warnings following his arrest.[17] Defendant counters that “the holding in Fletcher v. Weir, supra, does not apply where the defendant objects to cross-examination *172 about his having made a statement invoking his right to silence.” (Italics omitted.) Defendant further asserts that the holding in Fletcher v. Weir does not apply if the defendant does not testify at trial.
We need not, and do not, resolve this dispute, because we conclude that even if defendant had been given Miranda warnings at the time of his arrest, it still would have been proper for the prosecution—by introducing evidence that defendant consciously chose to remain silent—to attempt to rebut defendant’s assertion that his mental illness rendered him incapable of communicating. Because defendant had introduced evidence of his uncommunicativeness as alleged proof that he suffered from a mental illness, the prosecution was entitled to impeach or rebut such an inference by presenting to the jury evidence that established a different explanation for defendant’s lack of communication. The prosecution’s ability, in such circumstances, to show the reason for defendant’s silence should be no less than it would be had the prosecution introduced evidence that defendant had taken a vow of silence or suffered from laryngitis.
In United States v. Robinson (1988) 485 U.S. 25 [108 S.Ct. 864, 99 L.Ed.2d 23], defense counsel had urged in closing argument that the government had not allowed the defendant to explain his side of the story. The prosecutor during his summation informed the jury that respondent “ ‘could have taken the stand and explained it to you ....’” (Id. at p. 28 [108 S. Ct. at p. 867].) The federal court of appeals reversed the resulting judgment of conviction on the ground that the prosecutor had committed Griffin error by commenting upon the defendant’s exercise of his right to remain silent.
The United States Supreme Court disagreed: “We hold that the prosecutor’s statement that respondent could have explained to the jury his story did not in the light of the comments by defense counsel infringe upon respondent’s Fifth Amendment rights. The Court of Appeals and respondent apparently take the view that any ‘direct’ reference by the prosecutor to the failure of the defendant to testify violates the Fifth Amendment as construed in Griffin. We decline to give Griffin such a broad reading .... We think there is considerable difference for purposes of the privilege against compulsory self-incrimination between the sort of comments involved in Griffin and the comments involved in this case. [^Q ... In the present case it is evident that the prosecutorial comment did not treat the defendant’s silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case. Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant’s silence, Griffin holds that the privilege against *173 compulsory self-incrimination is violated. But where as in this case the prosecutor’s reference to the defendant’s opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege,” (United States v. Robinson, supra, 485 U.S. at pp. 31-32 [108 S.Ct. at pp. 868-869], italics added.)
The high court explained further: “ ‘[The] central purpose of a criminal trial is to decide the factual question of the defendant’s guilt or innocence, [citation]. . . .’ [Citation.] To this end it is important that both the defendant and the prosecutor have the opportunity to meet fairly the evidence and arguments of one another. The broad dicta in Griffin to the effect that the Fifth Amendment ‘forbids . . . comment by the prosecution on the accused’s silence,’ 380 U.S., at 615, must be taken in the light of the facts of that case. It is one thing to hold, as we did in Griffin, that the prosecutor may not treat a defendant’s exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some ‘cost’ to the defendant in having remained silent in each situation, but we decline to expand Griffin to preclude a fair response by the prosecutor in situations such as the present one.” (United States v. Robinson, supra, 485 U.S. 25, 33-34 [108 S.Ct. 864, 869-870].)
In People v. Austin (1994) 23 Cal.App.4th 1596 [28 Cal.Rptr.2d 885], a deputy sheriff testified that the defendant made a damaging admission shortly after his arrest and prior to being given Miranda advisements. On cross-examination, defense counsel elicited from the deputy that, when the defendant made this remark, the deputy did not ask him whether he would care to make “a full and complete statement.” (Id. at p. 1610.) On redirect examination, the prosecutor asked the deputy whether he later gave the defendant the opportunity to make a full statement. The deputy responded that he had by advising the defendant of his Miranda rights, but that the defendant had declined to make a further statement.
The defendant argued on appeal that the prosecutor’s reference to his post-Miranda silence violated his right to due process under Griffin and Doyle. The Court of Appeal disagreed, observing: “Griffin and Doyle were cases in which the prosecution sought to take unfair advantage of the defendant’s silence. . . . These cases stand for the principle it is fundamentally unfair for the state to afford defendants the right to remain silent and then use that silence against them. It must be remembered, however, the defendant’s right to remain silent is a shield. It cannot be used as a sword to cut off the prosecution’s fair response’ to the evidence or argument of the *174 defendant. [Citation.]” (People v. Austin, supra, 23 Cal.App.4th 1596, 1611-1612, italics added.)
The court in Austin explained that the defendant had “sought to create the impression in the jurors’ minds the police had treated him unfairly by not giving him the opportunity to explain his damaging statement . . . and to use the fact he had invoked his right to remain silent to prevent the prosecutor from countering this impression. The Fifth Amendment protects defendant’s right to remain silent. It does not protect his effort to exploit his silence by requiring the government also remain silent. Here, the prosecutor’s purpose on redirect examination of [the deputy sheriff] was to correct the impression created on cross-examination Austin had not been afforded an opportunity to explain the apparently damaging statement he made to [the deputy]. There was no attempt to suggest defendant’s invocation of his right to remain silent was substantive evidence of guilt or to impeach a defense by bringing out Austin’s postarrest silence. The rationale of Griffin and Doyle is inapplicable.” (People v. Austin, supra, 23 Cal.App.4th 1596, 1612-1613.)
The present case does not involve the type of circumstances to which the rule announced in Doyle, and applied in Greenfield, was intended to apply. Unlike the prosecution’s action in Doyle, the prosecution here did not use defendant’s silence at the time of his arrest to show that his testimony at trial was recently fabricated. Unlike Greenfield, the present case did not involve an attempt by the prosecution to use defendant’s invocation of his right to remain silent to show that defendant possessed the mental acuity to understand his constitutional rights. Rather, the prosecution introduced the evidence in question to show that defendant’s silence while incarcerated at the county jail was not probative of the extent of defendant’s mental illness, as the defense claimed, because—as defendant’s own statement to one of the psychiatric nurses indicated—defendant simply had chosen not to speak to the psychiatric personnel at the jail. This highly relevant evidence, responding to a claim put forward by defendant, was not rendered inadmissible simply because it revealed that defendant indicated that he chose not to speak in reliance upon his constitutional right to remain silent, rather than for some other reason.[18]
Defendant also contends that the following portions of the prosecutor’s argument during the sanity phase constituted misconduct, because they *175 denigrated defense counsel: “[The Prosecutor]: I am tired and bored. . . . [50 [Defense counsel] didn’t talk about the law an awful lot. He started off by kind of referring you to this definition and he got lost right at the start of his argument, and the reason why, he doesn’t understand the law. He doesn’t understand how it works. And he doesn’t understand what it really means. [1 Perhaps I can help.”
A short time later, the prosecutor addressed defense counsel, stating: “I heard you talking up here for an hour and a half and I sat through two weeks of this trial and the best you have done is prove to me that this guy has some kind of problem.” The prosecutor later added: “[T]here is nowhere in the law of California here that says you have got to have logical reasons in order to be found sane, or, in the alternative, if your reasons are irrational, you are insane. That is not the law. It is not in there. [¶] [Defense counsel] would like it to be. But it is not. That’s just not the law, and we know why.”
Defendant did not object to any of these remarks and, accordingly, is “deemed to have waived the objection and the point cannot be raised on appeal.” (People v. Green, supra, 27 Cal.3d 1, 27.) In any event, none of these comments constituted misconduct. “A prosecutor may ‘vigorously argue his case and is not limited to “Chesterfieldian politeness” ’ [citation] . . . .” (People v. Fosselman (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) It did not constitute misconduct for the prosecutor to assert that defense counsel’s argument reflected a misunderstanding of the relevant law.
Defendant next contends that the following portion of the prosecutor’s argument during the sanity phase constituted misconduct: “All of us know, we have seen people on the streets who are goofy, who were bizarre, who act funny, who did a lot of bizarre things that this defendant has done. We know, probably if you read today’s paper that about a third of our population has some type of mental problem or mental illness. It is fairly well established. Does that mean that everybody that has a problem automatically gets a free pass on three or four murders? I think most of us would say no, that kind of defies common sense. And I think something more than just proving up that a person has a problem should be required before we give him a free pass.” The prosecutor later returned to this theme, stating: “People do an awful lot of strange things. They have mental problems. Does that give them a free pass to go out and murder? Is that it?” Defense counsel objected, for the first time, stating: “There is no free pass on this even on a not guilty by reason of insanity.” The trial court sustained the objection. The prosecutor continued: *176 “Does that mean they can avoid criminal responsibility for their crimes? The answer is clearly no.” Thereafter, the prosecutor, on numerous occasions, spoke of avoiding criminal responsibility, rather than receiving a free pass.
We recognized in People v. Babbitt (1988) 45 Cal.3d 660, 702-703 [248 Cal.Rptr. 69, 755 P.2d 253] that it is proper for a prosecutor to argue that a finding that a defendant had diminished capacity at the time of the offense would “ ‘absolve . . . [the defendant] of all criminal responsibility’ ” because “the purpose and effect of a successful diminished capacity defense is to reduce or absolve the defendant’s criminal responsibility.” (Italics omitted.) We also held that it was proper for the prosecutor to argue that a finding that a defendant was insane at the time of the offense would let him “off the hook” because “[a]n accused who is found to have been insane is absolved of criminal responsibility [citations], and thus, in the colloquial, is ‘let off the hook.’ ” (Id. at p. 703.)
In the present case, the prosecutor’s suggestion—that finding defendant had been insane at the time of the offense would give him a “free pass” to commit murder—had the same effect as suggesting that such a finding would let defendant “off the hook.” We observed in People v. Babbitt, supra, 45 Cal.3d 660, 703-704, that arguing that finding defendants not guilty by reason of insanity leaves them “ ‘free to commit any crime they want’ ” is not improper, because “[i]n asserting that they thus would be ‘free’ to commit a crime, the prosecutor was referring not to a freedom from confinement, but to the freedom from criminal responsibility that follows from a finding of insanity.” (Italics omitted.) The same is true regarding the prosecutor’s reference in the present case to giving defendant a “free pass” to commit murder.
To the extent that the prosecutor’s use of the phrase “free pass” could have been understood by the jury to imply incorrectly that defendant would be set free if he was found not guilty by reason of insanity, any such error would not require reversal of the judgment. As discussed above, these few brief references were ambiguous at worst and did not clearly state that defendant would be set free. Defendant’s “speaking” objection noted that “[t]here is no free pass on this even on a not guilty by reason of insanity.” The trial court sustained the objection and the prosecutor did not use the phrase again, referring instead to whether defendant would avoid criminal responsibility. The prosecutor thus clarified that his earlier use of the ambiguous phrase “free pass” meant no more than avoiding criminal responsibility. It is not reasonably probable that, in the absence of any such error, the jury would have returned a finding more favorable to defendant. (People v. Babbitt, supra, 45 Cal.3d 660, 704.)
*177 Defendant further argues that, in light of the prosecutor’s admonition not to give defendant a “free pass” by finding him not guilty by reason of insanity, the trial court was required, sua sponte, to instruct the jury in accordance with CALJIC No. 4.01, which explains that a verdict of not guilty by reason of insanity would not result in the defendant’s immediate release.[19] In the alternative, defendant argues his counsel was ineffective for failing to request this instruction. We find neither argument persuasive.
Defense counsel in the present case submitted two proposed jury instructions based upon CALJIC No. 4.01. The first of these incorporated verbatim the text of CALJIC No. 4.01. The second proposed instruction, which defense counsel preferred, modified the text of CALJIC No. 4.01 to replace the term “sanity” with the phrase “mental health,” so as to state that if defendant were found not guilty by reason of insanity, he would remain in confinement “while the courts determine whether he has fully recovered his mental health” and would not be released “unless and until the court determines and finds the defendant’s mental health has been fully restored, in accordance with the law of California . . . .” Defense counsel proposed this modified version of CALJIC No. 4.01 because section 1026.2 states that a defendant may be released when his or her “sanity has been restored,” which is defined to mean that the defendant “is no longer a danger to the health and safety of others, due to mental defect, disease, or disorder.” Defense counsel was concerned that this definition of “sanity” differed from *178 the definition given to the jury in the sanity phase instructions that “[a] person is legally insane when by reason of mental disease or mental defect he was incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong. . . .” Defense counsel believed that CALJIC No. 4.01 might lead the jury to believe that, if defendant presently was capable of distinguishing right from wrong, a verdict of not guilty by reason of insanity could lead to his immediate release.
The trial court stated that the term “mental health” did not have a precise meaning, and gave defense counsel until the following morning to propose an alternate term. The following morning, defense counsel withdrew the proposed instruction that incorporated verbatim the text of CALJIC No. 4.01 and urged the court to give the proposed modified instruction using the term “mental health.” The court refused to give the proposed instruction as modified. Defendant does not claim on appeal that the trial court erred in refusing to give this proposed modified instruction, but argues the trial court should have instructed the jury, sua sponte, in accordance with CALJIC No. 4.01.
The trial court did not err in failing to give, sua sponte, an instruction based upon the text of CALJIC No. 4.01, after defendant withdrew his request for such an instruction. The premise of defendant’s argument, that an instruction based upon CALJIC No. 4.01 was necessitated by the prosecutor’s misconduct in using the phrase “free pass,” fails because, as explained above, the prosecutor’s use of that phrase did not constitute misconduct. Additionally, the issue is not whether the court had a duty to so instruct in the absence of a request by defendant, but whether the court had a duty to instruct after defendant clearly indicated he did not want such an instruction by withdrawing his request for it. Defendant cites no authority for the proposition that a trial court must, or should, give such an instruction against the wishes of the defendant. We decline to adopt such a rule.
We also conclude that defense counsel was not ineffective in withdrawing his request for a jury instruction based upon the text of CALJIC No. 4.01. “Reviewing courts defer to counsel’s reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a ‘strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.’ [Citation.] Defendant’s burden is difficult to carry on direct appeal, as we have observed: ‘ “Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.” ’ [Citation.]” (People v. Lucas, supra, 12 Cal.4th 415, 436-437.)
*179 The record reflects that defense counsel made a considered, tactical choice to withdraw the requested instruction. This choice was made following considerable discussion before the court and after defense counsel had the evening recess in which to consider the issue. As defense counsel obviously was aware, whether CALJIC No. 4.01 is beneficial to a defendant is open to doubt. Although the instruction was drafted to benefit defendants, the defendant in People v. Kelly, supra, 1 Cal.4th 495, 538, argued (without success) that the giving of such an instruction was reversible error. The instruction aids the defendant by assuring the jury the defendant will not be released immediately upon a verdict of not guilty by reason of insanity, but a defendant reasonably could choose not to request the instruction for fear it might focus the attention of the jury upon the possibility of the defendant’s release if he is restored to sanity. Defense counsel in the present case made a reasonable, tactical choice and was not ineffective in withdrawing his request for a jury instruction in the language of CALJIC No. 4.01.
Defendant contends the prosecutor committed misconduct during his sanity phase argument by referring to Adolph Hitler, Charles Manson, and Richard Chase (the “Sacramento Vampire Killer”). In attempting to make the point that the circumstance that a murder was committed for irrational reasons does not necessarily mean that the perpetrator is not guilty by reason of insanity, the prosecutor stated: “You see a homicide, especially a brutal homicide, and you say normal people don’t do that. Normal people don’t go out and hammer to death three . . . people, [f] And that is kind of a given. And if you look in the context of people who have problems who do these type killings, I don’t care if you take a Hitler, a Manson, you take a Richard Chase, the Sacramento vampire killer, all these people have problems and they had goofy and bizarre reasons for doing what they did. Hitler didn’t like Jews. He was obsessed with the Jewish race so he planned to exterminate them. Do you think Mr. Hitler had a problem, undoubtedly so. Do you think it is an obsession that he acted upon a bizarre brutal reason to go out and kill a bunch of people? Yes. Did he know what he was doing? You betcha. [f] Chase—” At that point, defendant objected, stating, “that doesn’t fit this definition. It is a different test as to what would happen as to Mr. Chase.” The court sustained the objection. The prosecutor made no further reference to Richard Chase, but continued the theme, without objection, with references to “these homicides in the paper. Woman kills her three children. This guy is in a tower, starts shooting down all these people in Texas, on and on and for reasons that you and I simply do not understand.”
Defendant’s sole objection was to the reference to Richard Chase. That objection was sustained, and defendant did not ask that the jury be admonished to disregard the previous reference to Chase. Accordingly, defendant *180 may not argue on appeal that the prosecutor’s references to Hitler, Manson, and Chase constituted reversible error. (People v. Bonin (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217]; People v. Green, supra, 27 Cal.3d 1, 27.)
In any event, the prosecutor’s references to notorious murderers did not constitute misconduct. It was proper for the prosecutor to use as examples notorious murderers who committed heinous crimes for irrational purposes but apparently were legally sane. The prosecutor did not suggest that the offenses charged against defendant were as heinous as those committed by Hitler, Manson, and Chase. (Cf. People v. Wein (1958) 50 Cal.2d 383, 396-397 [326 P.2d 457].) “In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence. [Citation.]” (People v. Bloom (1989) 48 Cal.3d 1194, 1213 [259 Cal.Rptr. 669, 774 P.2d 698].) In the present case, it was proper for the prosecutor to use these well-known examples of irrational murders to illustrate his point regarding the limits of the defense of insanity.
Defendant contends the following portion of the prosecutor’s sanity phase argument constituted misconduct because it mischaracterized the testimony of psychiatrist Dr. Captane Thomson: “First of all, you know this defendant is antisocial, and one of the paramount functions of being an antisocial or sociopath that this man is, he doesn’t care about the rights of others. He is amoral and unremorseful for this acts. You heard Captane Thomson tell you about that. And that is part of this defendant. And I told you in opening statement that was part of his problem.”
The prosecutor did not mischaracterize Dr. Thomson’s testimony. On cross-examination, Dr. Thomson stated that defendant was “antisocial” or a “sociopath,” and agreed that a characteristic of individuals with antisocial personality disorder or sociopathy is a lack of remorse. Dr. Thomson further agreed that defendant “is capable of doing sadistic acts and not even caring for what happened to the people that he did them to . . . .” Finally, Dr. Thomson acknowledged that when he spoke to defendant on March 8,1987, defendant “expressed to [Dr. Thomson] having no remorse for what he did to the victims . . . .”
Defendant’s additional argument that the cumulative prejudice of the prosecutor’s alleged misconduct during the guilt and sanity phases requires reversal of the judgment fails because, as discussed above, any prejudice arising from the sole instance of prosecutorial misconduct, which occurred during the guilt phase of the trial, was cured by the trial court’s admonition to the jury.

*181
Penalty Phase

Defendant argues that much of the prosecutor’s argument during the penalty phase of the trial constituted misconduct, but he did not object at trial to the numerous portions of the prosecutor’s argument he now claims constituted misconduct.[20] As noted above, the general rule is that such a failure to object waives the issue and precludes the defendant from raising it on appeal. (People v. Green, supra, 27 Cal.3d 1, 27.) Defendant argues that his lack of objection should be excused because a timely objection and admonition would not have cured the harm. (Id. at p. 34.) We disagree. Defendant argues that an objection and admonition would have been insufficient to cure the prejudice, because the instances of prosecutorial misconduct were “so numerous, and the misconduct so pervasive, multifaceted and serious . . . .” If defendant were correct that the disputed portions of the prosecutor’s argument were improper, a timely objection to the first instance of such misconduct might well have prompted a favorable ruling and prevented repetition of such improper argument. “The reason for this rule [requiring a timely objection], of course, is that ‘the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.’ [Citations.]” (Id. at p. 27.)
Defendant also argues that the requirement of a timely objection should not apply when “the prosecutor has committed misconduct which would result in a miscarriage of justice.” We considered and rejected this contention in People v. Green, supra, 27 Cal.3d 1, 28-34, and consistently have so ruled. (People v. Cain (1995) 10 Cal.4th 1, 48 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; People v. Carrera (1989) 49 Cal.3d 291, 321 [261 Cal.Rptr. 348, 777 P.2d 121].) Defendant presents no persuasive reason for reconsidering these holdings.
Defendant next argues that the court should have “intervened even absent an objection by counsel.” “[A] trial court has no sua sponte duty to control *182 prosecutorial misconduct. . . (People v. Carrera, supra, 49 Cal.3d 291, 321; People v. Montiel, supra, 5 Cal.4th 877, 914.)
In the alternative, defendant asserts that defense counsel’s failure to object deprived him of effective assistance of counsel. This claim fails because the record before us does not eliminate the possibility that counsel’s decision not to object “resulted from an informed tactical choice within the range of reasonable competence.” (People v. Pope (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)
Even if defendant had preserved the issue of prosecutorial misconduct by interposing timely objections, his claims of misconduct lack merit. Defendant first contends the prosecutor “mischaracterized the jury’s sentencing task as being solely to make ‘the punishment fit the crime’ rather than being to weigh the evidence in mitigation against the evidence in aggravation.” The record does not support this claim.
Near the beginning of his argument, the prosecutor stated: “The question is what should the punishment be for Jeffrey Jones murdering Michael Corbett and Harry Dong. That is the question that we have to focus on. And that is the question that is very, very important for you jurors to keep in mind, what punishment fits these crimes, because that’s what we are dealing with here.” Subsequently, the prosecutor made several additional references to making the punishment fit the crime.
The prosecutor’s statements that the jury’s task during the penalty phase deliberations was to determine “what punishment fits these crimes,” considered by themselves, were at worst ambiguous. Defendant urges us to construe these statements to mean that the jury should focus solely upon the circumstances of the offense to the exclusion of all other factors, but the prosecutor’s statements also can be understood to refer in a more general manner to the crimes committed by this particular defendant, and thus to encompass the mitigating factors regarding “the defendant’s character, background, history, mental condition and physical condition.” (§ 190.3.)
In any event, the prosecutor’s argument, considered as a whole, clearly did not suggest that the jury should limit its consideration to the circumstances of the capital offenses. The prosecutor described the “test” to be applied by the jury as “the process of how you go about weighing and balancing factors in aggravation or circumstances in aggravation, what makes it so heinous, so brutal, so bad, versus the factors in mitigation, anything the defense has offered to try and convince you that somehow the penalty for what he did to these people should be less than death. [*][] [I]n *183 order for the death penalty to be warranted after you have gone through this balancing process, the aggravating factors have to outweigh the mitigating factors so substantially that death is warranted.” The prosecutor added: “Everything you have heard from day one in the guilt phase, in the sanity phase, and the evidence and attempts to mitigate in the penalty phase. That is the balance.”
The prosecutor then referred to a chart of the statutory factors listed in section 190.3[21] and observed that “the law very strictly and very severely limits the type [of] things that you are allowed to consider in aggravation. . . . [Factors] (a), (b) and (c) are the only things the law permits you as a jury when you are fixing this appropriate punishment to consider in aggravation. That is the first thing you will observe. [¶] The second thing you will observe is the contrary is true with respect to the things that you can consider in mitigation, to say or to make you feel that Mr. Jones, for what you did, what you did to Harry Dong, what you did to Michael Corbett and knowing these other violent acts that you did, that somehow you should receive less than the death penalty. These factors, (d) through (k) are essentially the mitigational factors that the law says that you are allowed to consider. So it is wide open. [¶] And I think you can tell from the bottom one, (k), it is anything the defense can give to you to try and convince you that for these crimes somehow the punishment ought to be something other than death. So it is wide open.”
The prosecutor next discussed each of the statutory factors listed in section 190.3, offering his opinion as to which applied to the present case. He told the jury it would have to consider the factors in mitigation relied *184 upon by defendant regarding whether he committed the murders while “under the influence of extreme mental or emotional disturbance,” “[whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect . . . and “[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.” (§ 190.3, factors (d), (h), and (k).)
Contrary to defendant’s assertion, the prosecutor did not urge the jury to ignore the mitigating evidence relied upon by defendant. Rather, the prosecutor forcefully and properly argued that the factors in mitigation relied upon by defendant were entitled to little Weight, and were substantially outweighed by the aggravating factors of the circumstances of the offenses and the evidence of other violent criminal activity. “A prosecutor does not mischaracterize [mitigating] evidence by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature. [Citations.]” (People v. Cox (1991) 53 Cal.3d 618, 683 [280 Cal.Rptr. 692, 809 P.2d 351].)
The prosecutor told the jury it could consider sympathy or pity for defendant, but then asked the jury, “is Jeffrey Jones truly deserving of your sympathy, or your mercy.” The prosecutor later stated: “I submit to you that under the evidence there is nothing about Jeffrey Jones’ life and what he did that should ever make you want to reward him with your sympathy or your mercy . . . .” Finally on this point, the prosecutor added: “And all of us would have to agree, there is nothing that is sympathetic about Mr. Jones. There is nothing that you can grab a hold here and hold on to to say that he deserves my sympathy, that I have a right to give it to him and he deserves it to mitigate the punishment. It doesn’t exist.”
Defendant asserts that the prosecutor’s argument that defendant was not entitled to the jury’s sympathy “was tantamount to asserting that the jurors should disregard as irrelevant all of the mitigating evidence presented.” (Italics in original.) As noted above, the prosecutor did not argue that evidence relied upon by defendant to elicit sympathy was irrelevant. The prosecutor properly argued that, based upon all of the evidence presented, defendant was not entitled to the jury’s sympathy.
Defendant contends the prosecutor told the jury it had no right to consider a sentence other than death. That is not a fair reading of the prosecutor’s comment. The prosecutor argued that sparing defendant the death penalty would be an act of leniency, and asked the jury: “Would such a gift of leniency—where does it come from? Is it even your right to give it *185 in this case? Does it really fit what he did to these people, his conduct?” Considered in context, the prosecutor’s argument simply questioned whether the jury should impose a lenient sentence if the circumstances in aggravation outweighed those in mitigation. In the context of the court’s instructions to the jury, the prosecutor’s argument could not have misled the jury concerning the factors they properly were to consider in determining the appropriate penalty.
Defendant claims it was improper for the prosecutor to argue that the jury should not impose a life sentence based upon evidence that “as a young kid, Mr. Jones was kind of okay.” The prosecutor stated that directing the jury’s attention to defendant’s behavior as a child was “a proper legal maneuver that is employed [by the defense] to shift you away from looking at the real question of fitting that appropriate punishment to the crime,” and argued further that every murderer on death row “really probably grew up as a kid, nice kid.” As we held regarding a similar argument in People v. Sims (1993) 5 Cal.4th 405, 464 [20 Cal.Rptr.2d 537, 853 P.2d 992], this argument was proper because the prosecutor “did not imply that the jury should disregard the evidence of defendant’s background, but rather that, in relation to the nature of the crimes committed, it had no mitigating effect.”
Defendant characterizes as misconduct the prosecutor’s argument that not to impose the death penalty for the crimes committed by defendant “would make the death penalty meaningless.” Although overstated, the import of this comment is that the present case is precisely the type in which the death penalty should be imposed. This is within the bounds of proper argument.
The prosecutor observed that death is a subject people “do not like to talk about” and “probably have difficulty in dealing with and discussing.” Even though it may be difficult for the jurors “to face the concept of death,” he continued, “[y]ou have to face up to it individually as members of this jury and collectively in your verdict.” The prosecutor argued that there is a “type of courage that you have to have in looking at this decision, the type [of] courage that maybe a soldier has on the eve of battle when he knows he’s going to get involved. ... It is the type [of] courage you would have to have, perhaps if you are a terminal patient and you know you are looking at death.” Defendant contends this argument was improper because it told the jury “that failing to impose a sentence of death would mean the jurors lacked ‘courage.’ ” This mischaracterizes the prosecutor’s argument. It was proper for the prosecutor to argue that determining the appropriate punishment in a capital case is a difficult decision that requires courage.
Defendant asserts that it was improper for the prosecutor to state that the jury acted as “the conscience of the community,” because it “diminished the *186 jurors’ sense of individual responsibility for the decision to be made.” We disagree. One function of a jury is to represent the community. As the United States Supreme Court stated in Witherspoon v. Illinois, supra, 391 U.S. 510, 519-520 [88 S.Ct. 1770, 1775], “a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death.” (Fn. omitted.)
Defendant contends the prosecutor committed misconduct by characterizing defendant’s evidence of mental illness as “riddled with holes” and “ethereal.” The prosecutor stated: “The evidence is riddled with holes, just literally riddled with holes about his mental defect, if he had one, what it was, did he malinger it, if so, how much, did he have a defect at all, was he just antisocial, is he a sociopath. What really was his problem. The evidence is just, it is ethereal. It is nothing you can grab hold of.” These were fair comments upon the evidence presented. (People v. Clark (1993) 5 Cal.4th 950, 1029-1030 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)
Without citation to authority, defendant asserts the prosecutor mischaracterized the testimony of the many mental health professionals by arguing that defendant committed the murders because he was a sociopath, and assigns racial overtones to the prosecutor’s statement that there is “a black spot on the soul” of defendant. The prosecutor argued: “Did he do these killings just because he is antisocial? Or a sociopath? .... I submit to you that the evidence in this case . . . shows you that there is a dark, a black spot on the soul of Mr. Jones. He has that evil in him, and I don’t think anybody here can dispute that.” The prosecutor’s argument that defendant is a sociopath was a reasonable comment upon the evidence, and there is no indication that the prosecutor’s image of a black spot on defendant’s soul was intended, or understood, as a racial slur.
Defendant asserts that the prosecutor misled the jury to believe that defendant had presented no mitigating evidence under section 190.3, factor (h), relating to whether defendant’s capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired by mental illness, and misled the jury concerning the proper application of that factor. The prosecutor stated: “First of all, did he, was he so impaired that literally he didn’t know that his crimes were criminal, that his conduct was criminal, he couldn’t appreciate his criminality? We have virtually answered that in the sanity case. . . . And that is one of the reasons why [defense counsel] will have some difficulty with factor (h) in trying to tell you that it is a valid mitigating factor here.”
Defendant alleges that it was incorrect to compare section 190.3, factor (h), to the test for sanity, because factor (h) does not state a “test” but rather *187 identifies factors for the jury to consider. Even if we accepted defendant’s premise, it would establish at most that the prosecutor misstated the law in his argument to the jury, and not that the prosecutor committed misconduct.
“In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. [Citations.]” (People v. Price (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) “ ‘[A] prosecutor is not guilty of misconduct because in his argument of the law to the jury, he is wrong as to the law. Misconduct occurs only where an erroneous proposition of law was argued in bad faith [citation].’ [Citations.]” (People v. Bonin, supra, 46 Cal.3d 659, 702.) Earlier in his argument, the prosecutor correctly told the jury they should consider whether section 190.3, factor (h), applied, accurately described factor (h) as “whether or not at the time [defendant] did these crimes his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired,” and stated that this was “the essence of what the defense is trying to tell you is their mitigational evidence.” Whether or not the prosecutor later misstated the law in some respects, there is no evidence of bad faith and, hence, no evidence of misconduct.
Defendant argues that the prosecutor improperly characterized defendant’s mental illness as an aggravating factor, rather than a mitigating factor, by arguing that the jury should not feel sympathy for defendant because defendant, during his adult life, “dropped out. He quit. He was a failure. He told people that. His actions speak for it. He wasn’t going to work. He didn’t work.” Defendant reasons that this comment constituted misconduct because it was defendant’s mental illness that caused him to be a failure. The prosecutor, however, relied upon a contrary theory that defendant chose not to contribute to society and exaggerated the symptoms of his mental illness to excuse his behavior. As noted above, “[a] prosecutor does not mischaracterize [mitigating] evidence by arguing it should not carry any extenuating weight when evaluated in a broader factual context. We have consistently declined to criticize advocacy of this nature. [Citations.]” (People v. Cox, supra, 53 Cal.3d 618, 683.)
Defendant argues that the prosecutor committed misconduct by telling the jury that they could consider sympathy under factor (k) of section 190.3, “[b]ut that [such] sympathy or pity or passion has to be to this defendant, not his mom, not his brothers, not the victims in the case, not to their families.” The prosecutor’s argument accurately anticipated the decisions in Booth v. Maryland (1987) 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440] and South Carolina v. Gathers (1989) 490 U.S. 805 [109 S.Ct. 2207, 104 L.Ed.2d 876], which held that the jury in capital sentencing proceedings *188 is not permitted to consider sympathy for the victim or the victim’s family. The United States Supreme Court, however, later reconsidered these holdings and, in Payne v. Tennessee (1991) 501 U.S. 808 [111 S.Ct. 2597, 115 L.Ed.2d 720], held that the jury could consider evidence of the characteristics of the victim and the impact of the crime on the victim’s family. Neither the high court nor this court yet has decided whether the jury may consider evidence of the impact a judgment of death would have upon the defendant’s family. (See People v. Beeler (1995) 9 Cal.4th 953, 991 [39 Cal.Rptr.2d 607, 891 P.2d 153]; People v. Bacigalupo, supra, 1 Cal.4th 103, 143.) Whether or not the prosecutor’s argument accurately described the present state of the law on this point, it certainly did not constitute misconduct. As is true of defendant’s additional contentions that the prosecutor misstated the law regarding the jury’s consideration of sympathy under factor (k), the circumstance that the prosecutor misstated the law during argument does not, standing alone, establish misconduct. (People v. Bonin, supra, 46 Cal.3d 659, 703.)
Defendant asserts the prosecutor urged the jury to consider the testimony of defendant’s mother as evidence in aggravation, rather than mitigation. Defendant draws this conclusion from the prosecutor’s observation during argument that some jurors had cried during the testimony of defendant’s mother, and the prosecutor’s statement that he had “the very distinct and strong feeling that those tears were for Mrs. Jones and the pain and the grief and the sorrow that this defendant caused by his acts. They weren’t for Jeffrey Jones.” The prosecutor continued that he had “the strong and distinct feeling, almost certain feeling that a portion of the tears that [he] saw during that testimony may well have been for the victims in this case, their families, their hopes, their dreams, their survivors. They were not for Jeffrey Jones.” This was proper argument. It was proper for the prosecutor to suggest that the emotions displayed by some of the jurors were caused by the effect of defendant’s crime, rather than by pity for defendant and his family.
Without citation to authority, defendant contends the prosecutor committed misconduct by arguing to the jury that murder victims Corbett and Dong felt terror and pain when they were attacked. Defendant asserts that the record establishes that both victims felt no terror or pain because they immediately were rendered unconscious by defendant’s first blow. The record does not support defendant’s assertion. Evidence was introduced that Corbett screamed upon being attacked, which supports the inference that he experienced pain and terror before being rendered unconscious. Dong suffered multiple wounds, including wounds to his face, a circumstance supporting the inference that he tinned to face his attacker before being rendered unconscious. “We repeatedly have stated that ‘[t]he prosecution has broad *189 discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom.’ [Citations.]” (People v. Sims, supra, 5 Cal.4th 405, 463.) The prosecutor’s argument that these victims experienced pain and terror was based upon reasonable inferences from the record and was proper. (People v. Garceau (1993) 6 Cal.4th 140, 206 [24 Cal.Rptr.2d 664, 862 P.2d 664].)
Defendant contends it was misconduct for the prosecutor to argue that the jury should not conclude that life in prison would be a suitable punishment for the reason that the conditions in prison are “very bad.” Because no evidence was introduced concerning conditions in prison, the prosecutor was correct that it would be improper for the jury to base its decision upon speculation concerning prison conditions. Also, the conditions of confinement during a life sentence do not constitute mitigating circumstances. (People v. Zapien (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704]; People v. Daniels (1991) 52 Cal.3d 815, 877 [277 Cal.Rptr. 122, 802 P.2d 906].) The prosecutor’s argument was not improper.

Jury Instructions

Defendant contends the trial court committed reversible error by refusing defendant’s request that it instruct the jury as follows: “A sentence of life imprisonment without possibility of parole means that Defendant Jeffrey Gerard Jones will remain in state prison for the rest of his life and will not be paroled at any time. A sentence of death means that Defendant Jeffrey Gerard Jones will be executed.” The trial court properly refused the requested instruction, because it is inaccurate. “The Governor may ameliorate any sentence by use of the commutation or pardon power, and it is thus ‘ “incorrect to tell the jury the penalty of . . . life without possibility of parole will inexorably be carried out” [citation].’ ” (People v. Arias (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980].)
Relying upon the decision in Simmons v. South Carolina (1994) 512 U.S. 154 [114 S.Ct. 2187, 129 L.Ed.2d 133], defendant claims the trial court was required, upon request, to inform the jury that, if sentenced to life in prison, he would be ineligible for parole. We considered and rejected this precise issue in People v. Arias, supra, 13 Cal.4th 92, observing that, in Simmons, the jury was told only that the defendant “would suffer ‘life imprisonment,’ ” “and the court barred all reference during the trial to the defendant’s ineligibility for parole.” (Id. at p. 172.) “The due process deficiencies in the Simmons trial do not exist in a California capital penalty trial. Every California penalty jury is specifically instructed that it must choose between two possible sentences, death or ‘confinement in [the] state prison for a term *190 of life without [the] possibility of parole.’ [Citation.]” (Id. at p. 173, italics in Arias.)
Defendant contends the trial court erred in instructing the jury in the language of section 190.3, factors (d) and (h), that it could consider “[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance” and “[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication.” Defendant asserts these instructions misled the jury to believe that his mental illness could not be considered as a mitigating factor unless it had influenced his commission of the crime and was “extreme.”
We previously have considered and rejected the argument that it is error to instruct the jury in the language of section 190.3, factor (d), that it may consider whether the defendant suffered from “extreme mental or emotional disturbance,” holding that such an instruction “does not unconstitutionally preclude the jury from considering mental or emotional disturbances that are not ‘extreme.’ Rather, the ‘catchall’ provisions in section 190.3, factor (k), ‘referring to “[a]ny other circumstance which extenuates the gravity of the crime,” allow consideration of nonextreme mental or emotional conditions.’ [Citations.]” (People v. Turner (1994) 8 Cal.4th 137, 208 [32 Cal.Rptr.2d 762, 878 P.2d 521].) This reasoning compels us to reject as well defendant’s argument that the challenged instructions limited the jury to considering only evidence of mental disturbance that influenced his commission of the charged offenses.

Automatic Motion for Modification of Penalty Verdict

Defendant contends the judgment must be reversed and the case remanded to the trial court for reconsideration of the trial court’s denial of defendant’s automatic motion for modification of the penalty verdict, because the trial court erred in several respects in denying the motion.
“In ruling on a verdict-modification application, the trial judge is required by section 190.4(e) to ‘make an independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.’ [Citations.] That is to say, he must determine whether the jury’s decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. [Citation.]” (People v. Marshall (1990) 50 *191 Cal.3d 907, 942 [269 Cal.Rptr. 269, 790 P.2d 676].) “[T]he trial judge’s function is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge’s independent judgment, the weight of the evidence supports the jury verdict. [Citations.]” (People v. Lang (1989) 49 Cal.3d 991, 1045 [264 Cal.Rptr. 386, 782 P.2d 627], italics in original.)
“On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court’s determination after independently considering the record; we do not make a de novo determination of penalty.” (People v. Mickey (1991) 54 Cal.3d 612, 704 [286 Cal.Rptr. 801, 818 P.2d 84].)
Defendant contends the trial court’s determination—that his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was not impaired—“flies in the face of the unanimous, uncontroverted expert testimony.” In reviewing the factors listed in section 190.3, the trial court stated: “[T]he Court finds there is credible evidence to show that the defendant did in fact appreciate the criminality of his conduct, even though he suffered from a mental disturbance. The defendant, following his brutal attack on Michael Corbett, when fleeing the murder scene, conveyed by his words and acts his appreciation of the wrongfulness of his acts.” The trial court’s conclusions are supported by the record.
When defendant was confronted as he left the restroom in which Corbett was killed, he made an apparent attempt to explain the screams of the victim by stating: “That guy in there is crazy.” When the victim was discovered a few moments later, defendant took off running. When defendant was apprehended, he stated: “I have been framed.” The trial court correctly concluded that these circumstances constituted strong evidence that defendant understood the wrongfulness of his conduct and attempted to avoid responsibility.
Defendant argues that the trial court’s ruling contradicts the opinion of “every mental health expert who testified regarding [defendant’s mental state at the time of the offenses.” Defendant fails to acknowledge that neither the court nor the jury is “bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury [and the court] may, however, disregard any such opinion, if it shall be found by them to be unreasonable.” (§ 1127b.) Defendant also fails to acknowledge the substantial evidence, discussed above, suggesting *192 that defendant was malingering by exaggerating the symptoms of his mental illness.
Defendant also contends that the trial court erroneously considered the absence of mitigating circumstances as constituting aggravating circumstances. Defendant first points to the court’s statement that because defendant was aware of the wrongfulness of his conduct, despite his mental illness, “the Court finds this is not a factor in mitigation but rather a factor in aggravation.” “Although the absence of a mitigating factor is not itself an aggravating factor, the court may properly consider in aggravation the ‘objective circumstances of the killing.’ [Citation.]” (People v. Cooper (1991) 53 Cal.3d 771, 848 [281 Cal.Rptr. 90, 809 P.2d 865].) It was proper for the court to consider in aggravation the circumstances that defendant committed three brutal, unprovoked attacks on unarmed and unsuspecting victims, killing two of them, with full awareness of the wrongfulness of his conduct. As we noted in rejecting a similar contention in People v. Clair (1992) 2 Cal.4th 629, 690 [7 Cal.Rptr.2d 564, 828 P.2d 705]: “Given a reasonable reading, the quoted words reveal nothing more than a determination—which was altogether sound—that the circumstances of the crime, including defendant’s evident mental capacity, were aggravating.”
To the extent that the court erred in considering as a factor in aggravation the absence of evidence of impairment of defendant’s ability to appreciate the criminality of his conduct, such error was not prejudicial. The trial court carefully considered each of the statutory factors and concluded “that the aggravating circumstances far outweigh any of the mitigating circumstances.” (Italics added.) “Reviewing the court’s full statement, we are satisfied that any misunderstanding ‘had no impact on the court’s decision to deny the motion.’ [Citation.]” (People v. Cooper, supra, 53 Cal.3d 771, 848.)
The foregoing reasoning leads us to reject as well defendant’s contention that the trial court erred in considering as a factor in aggravation the circumstance that defendant committed the charged offenses “personally and alone.”
Defendant contends that the trial court applied the wrong standard in determining that the offense was not committed while defendant was under the influence of extreme mental or emotional disturbance. The trial court stated: “There is credible evidence that the offense was committed while the defendant was under the influence of a mental and emotional disturbance, but the Court is not prepared to find that it was of such extreme or emotional disturbance to justify his acts. [¶] There is further evidence that clearly establishes the defendant knew what he was doing. . . . [¶] But I am *193 finding that, and am considering the fact that there was evidence of some mental and emotional disturbance. The Court is considering that as a mitigating factor, although it is a slight mitigating factor.” The court later observed, in discussing under section 190.3, factor (h), whether defendant’s capacity to appreciate the criminality of his conduct was impaired, that defendant’s “mental disease or defect was not of such a magnitude that it outweighed his ability to distinguish right from wrong and to appreciate that what he was doing was in fact wrong.” According to defendant, these comments “reflect that [the trial court] erroneously believed that in order to constitute mitigation, [defendant]’s mental disturbance must have been of a nature to have reduced his legal culpability for his crimes.” (Italics in original.) This misconstrues the court’s remarks. The court clearly stated that it was considering as a mitigating factor the evidence of defendant’s mental and emotional disturbance. Certainly, the circumstance that, despite his mental impairment, defendant “knew what he was doing” and could distinguish right from wrong properly affects the weight of this mitigating factor. In light of the other evidence, discussed above, of defendant’s malingering and appreciation of the nature of his crimes, the trial court was justified in concluding that the weight of the evidence related to this factor was “slight.”
The trial court considered the brutal and savage manner in which the offenses were committed as an aggravating factor. In a rather convoluted argument, defendant contends that, “because the manner in which the crimes were committed” demonstrated his mental illness, the trial court’s consideration of the circumstances of the crimes as an aggravating factor constitutes an improper consideration of defendant’s mental illness as an aggravating factor. We disagree.
As we have stated repeatedly, the trial court’s conclusion that defendant understood the wrongfulness of his conduct is supported by substantial evidence. Accordingly, the trial court did not err in considering as a factor in aggravation the circumstance that defendant purposefully committed three brutal and savage murders and one attempted murder.
Defendant further asserts the motion for modification of the verdict should have been granted because a sentence of death constitutes disproportionate punishment in light of defendant’s mental illness. We disagree. As defendant recognizes, we have held that “[comparative sentence review, statistical or otherwise, is not required by the federal Constitution. [Citation.]” (People v. Webb (1993) 6 Cal.4th 494, 536 [24 Cal.Rptr.2d 779, 862 P.2d 779].) “[W]e have also consistently declined to undertake such review under the due process, equal protection, and cruel or unusual punishment clauses of the state Constitution. [Citations.]” (Ibid.) We continue to adhere to those decisions.
*194 Defendant contends the sentence of death is disproportionate to his personal culpability because his crimes were the result of mental illness. (People v. Webb, supra, 6 Cal.4th 494, 536.) As noted above, the record reflects substantial evidence supporting the opposite conclusion that defendant’s crimes were not the result of his mental illness, but were planned by defendant and knowingly committed in a brutal and savage manner. The trial court did not err in concluding that, despite the evidence of defendant’s mental illness, the death penalty was not disproportionate to defendant’s personal culpability.

Jury Misconduct

Defendant contends the trial court abused its discretion in denying his request, immediately prior to sentencing, to call a juror to the witness stand to examine her concerning a possible instance of juror misconduct. As explained below, the trial court did not abuse its discretion.
At the time set for sentencing, the following colloquy occurred:
“[Defense counsel]: Before proceeding with judgment and sentencing, the defense requests I be allowed to call one witness to examine one issue as it related to jury deliberations.
“The Court: As an offer of proof, what area are you intending to go into?
“[Defense counsel]: I received some information that one juror had done some research in the medical area as it related to some of the testimony that came into the court, and many of the jurors on this case really didn’t want to interview with the defense. . . . [¶ What we have done is to subpoena [Juror Chamness] so that we can examine her to ask her what did she look up and what particular information was imparted from what she learned and discussed with the other jurors . . . .”
When the court asked defense counsel for the basis of his belief, counsel made a brief reference to a discussion his investigator had had with another juror, and then stated that when Juror Chamness “received the subpoena she telephoned my office and indicated she was displeased with receiving the subpoena and that she did look up something because she works at a medical facility and she considered that part of her job. And she believed that her obligation as a juror is to discuss the case and deliberate. And so that is all the information I have at the present time.” The trial court denied the request to have the juror testify.
In People v. Hedgecock (1990) 51 Cal.3d 395, 419 [272 Cal.Rptr. 803, 795 P.2d 1260], we held “that it is within the discretion of a trial court to conduct *195 an evidentiary hearing to determine the truth or falsity of allegations of jury misconduct, and to permit the parties to call jurors to testify at such a hearing. This does not mean, however, that a trial court must hold an evidentiary hearing in every instance of alleged jury misconduct. The hearing should not be used as a ‘fishing expedition’ to search for possible misconduct, but should be held only when the defense has come forward with evidence demonstrating a strong possibility that prejudicial misconduct has occurred. Even upon such a showing, an evidentiary hearing will generally be unnecessary unless the parties’ evidence presents a material conflict that can only be resolved at such a hearing.” (Fn. omitted.) It is clear, under this standard, that the trial court did not abuse its discretion in denying defendant’s request to call the juror as a witness.
Initially, it must be noted that the decision in People v. Hedgecock, supra, 51 Cal.3d 395, involved a request for an evidentiary hearing in connection with a motion for new trial based upon allegations of juror misconduct. In the present case, defendant did not bring a motion for new trial. He simply asked for permission to call a juror to the witness stand in order to determine whether she had engaged in misconduct. No authority of which we are aware condones such a practice.
The request would have fared no better, moreover, had it been made in connection with a motion for new trial. The trial court, in denying the request, properly characterized it as “a fishing expedition.” Defense counsel stated only that his investigator had received some undescribed information from another juror and that Juror Chamness had telephoned his office and indicated “that she did look up something.” The offer of proof did not reveal what information Juror Chamness received, or whether she communicated this information to other jurors. Defense counsel candidly acknowledged that he wished to examine the juror to determine whether misconduct had occurred. Defense counsel did not present “evidence demonstrating a strong possibility that prejudicial misconduct has occurred.” (People v. Hedgecock, supra, 51 Cal.3d 395, 419.) Even if defendant had satisfied this threshold requirement, an evidentiary hearing would not have been necessary, because the offer of proof did not present “a material conflict that [could] only be resolved at such a hearing.” (Ibid.)
Defendant’s claim also fails because defendant has not demonstrated that he was prejudiced by the trial court’s denial of his request to examine the juror. The record before us provides no basis upon which we can determine whether, had she been called as a witness, the juror would have provided evidence of juror misconduct.

*196
Validity of Death Penalty Statute

Defendant contends the death penalty statute is unconstitutional because it fails adequately to narrow the class of death eligible defendants. We previously have considered and rejected this precise contention. People v. Ray (1996) 13 Cal.4th 313, 356-357 [52 Cal.Rptr.2d 296, 914 P.2d 846]; People v. Crittenden (1994) 9 Cal.4th 83, 154-155 [36 Cal.Rptr.2d 474, 885 P.2d 887].)
Defendant also contends that the death penalty statute is unconstitutional because it grants the prosecutor unbridled discretion whether to allege special circumstances and whether to seek the death penalty. We previously have considered and rejected these contentions. (People v. Arias, supra, 13 Cal.4th 92, 189-190; People v. Crittenden, supra, 9 Cal.4th 83, 152; People v. Kirkpatrick (1994) 7 Cal.4th 988, 1024 [30 Cal.Rptr.2d 818, 874 P.2d 248].)
Defendant contends the death penalty statute is unconstitutional because it fails (1) to specify whether each sentencing factor is aggravating or mitigating, (2) to require that the jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors and that death is the appropriate sentence, (3) to require the jury to agree unanimously that a particular aggravating factor was proved beyond a reasonable doubt, (4) to include a presumption that life imprisonment without the possibility of parole is the appropriate sentence, and (5) to require written findings from the jury specifying the particular aggravating factors upon which it relied. We previously have considered and rejected these contentions. (People v. Arias, supra, 13 Cal.4th 92, 187-188, 190; People v. Crittenden, supra, 9 Cal.4th 83, 152-153.)
III
The judgment is affirmed in its entirety.
Baxter, J., and Chin, J., concurred.

 All further statutory references are to the Penal Code unless otherwise indicated.

 Section 1368 states, in pertinent part: “(a) If, during the pendency of an action and prior to judgment, a doubt arises in the mind of the judge as to the mental competence of the defendant, he shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. ... [TO (b) If counsel informs tile court that he believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant’s mental competence is to be determined in a hearing which is held pursuant to Sections 1368.1 and 1369. If counsel informs the court that he believes the defendant is mentally competent, the court may nevertheless order a hearing. Any hearing shall be held in the superior court. [*1 (c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined.”

 Welfare and Institutions Code section 5150 states, in pertinent part: “When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, [or a] member of the attending staff, as defined by regulation, of an evaluation facility designated by the county . . . may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.” Welfare and Institutions Code section 5151 states, in pertinent part: “If the facility for 72-hour treatment and evaluation admits the person, it may detain him or her for evaluation and treatment for a period not to exceed 72 hours.”

 “Antipsychotic drugs, sometimes called ‘neuroleptics’ or ‘psychotropic drugs,’ are medications commonly used in treating mental disorders such as schizophrenia. . . . [T]he effect of these and similar drugs is to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind.” (Washington v. Harper (1990) 494 U.S. 210, 214 [110 S.Ct. 1028, 1032, 108 L.Ed.2d 178]; see also Riese v. St. Mary’s Hospital & Medical Center (1987) 209 Cal.App.3d 1303, 1310-1311 [271 Cal.Rptr. 199].)

 Welfare and Institutions Code section 5250 provides, in pertinent part: “If a person is detained for 72 hours under the provisions of Article 1 (commencing with Section 5150). . . and has received an evaluation, he or she may be certified for not more than 14 days of intensive treatment related to the mental disorder or impairment by chronic alcoholism. . . .”

 Because the People have not sought correction of the record by application to this court pursuant to California Rules of Court, rule 12(b), we need not, and do not, decide whether the trial court’s previously unexpressed observations of defendant constitute unreported “oral proceedings” that may be included in a settled statement under California Rules of Court, rule 36(b). (People v. Hardy (1992) 2 Cal.4th 86, 183, fn. 30 [5 Cal.Rptr.2d 796, 825 P.2d 781]; People v. Williams (1988) 44 Cal.3d 883, 921 [245 Cal.Rptr. 336, 751 P.2d 395]; People v. Gzikowski (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].)

 The United States Supreme Court recently observed that “the ‘inexactness and uncertainty’ that characterize competency proceedings may make it difficult to determine whether a defendant is incompetent or malingering. . . . [T]here is no reason to believe that the art of dissimilation is new. Eighteenth and nineteenth century courts, for example, warned jurors charged with making competency determinations that ‘ “there may be great fraud in this matter,” ’ [citations] and that *[i]t would be a reproach to justice if a guilty man . . . postponed his trial upon a feigned condition of mind, as to his inability to aid in his defense,’ [citation].” (Cooper v. Oklahoma, supra, 517 U.S. at p. __ [116 S.Ct. at p. 1382, 134 L.Ed.2d at p. 513], fn. omitted.)

 Defendant also cites, but does not discuss, article I, section 15, of the California Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution.

 Defense counsel further noted that the prior jury impaneled for the competency trial also had been composed entirely of Caucasians. In addition, defense counsel subsequently challenged the selection of the alternates for the trial of the guilt, sanity, and penalty phases, after the prosecutor struck the only minority member, a Hispanic, from the panel of prospective alternates. On appeal, defendant does not challenge either the jury selection for the competency trial or the selection of the alternate jurors for the guilt, sanity, and penalty phases of the trial.

 See People v. Montiel, supra, 5 Cal.4th 877, 910, footnote 8, and People v. Turner (1986) 42 Cal.3d 711, 718-719 [230 Cal.Rptr. 656, 726 P.2d 102]. As we have done in the past, we emphasize that trial courts “should in every instance make an express determination whether or not the prima facie showing requirement has been met.” (People v. Fuentes (1991) 54 Cal.3d 707, 716-717, fn. 5 [286 Cal.Rptr. 792, 818 P.2d 75].)

 The prosecutor was not asked, and did not explain, why he felt it necessary to choose among these three prospective jurors.

 Defendant urges us to reconsider our holdings in Johnson and Montiel and adopt instead the approach reflected in the opinions in Johnson v. Vasquez (9th Cir. 1993) 3 F.3d 1327 and United States v. Chinchilla (9th Cir. 1989) 874 F.2d 695. We decline to do so.

 The dissent asserts that the prosecutor’s explanation was insufficient to establish a nonracial basis for the peremptory challenge to prospective juror Parker, because the juror’s answers on voir dire “demonstrated that she could, and would, follow the law in this cause.” (Dis. opn., post, at p. 205.) But, although a challenge for cause will not lie if a juror’s responses indicate that he or she could and would follow the law (cf. People v. Mayfield (1997) 14 Cal.4th 668, 727 [60 Cal.Rptr.2d 1, 928 P.2d 485]), a party may exercise a peremptory challenge against such a juror if that party believes, for any nondiscriminatory reason, that the juror may be unfavorable. In rejecting a Wheeler claim in People v. Davenport (1995) 11 Cal.4th 1171, 1201-1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068], we noted that “we have previously upheld the prosecutor’s exercise of peremptory challenges against death penalty skeptics—i.e., prospective jurors who, although not excusable for cause nevertheless expressed reservations about the death penalty. [Citation.]” (Id. at p. 1202, italics added.) We explained that such aversion to the death penalty, although not a basis for a challenge for cause, properly could constitute a “nonrace-related reason[]. . . why a prosecutor might want to excuse [a] prospective juror[].” (Id. at p. 1201.)

 Section 190.3 states, in relevant part: “[N]o evidence shall be admitted [during the penalty phase] regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. ... [¶] ... [¶] In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime .... [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction.”

 Defendant quotes additional portions of the prosecutor’s arguments to which no objections were interposed at trial. It is not clear whether defendant is claiming that these comments constituted misconduct, but because he failed to object, he is “deemed to have waived the objection and the point cannot be raised on appeal.” (People v. Green (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

 Miranda v. Arizona (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

 Following oral argument, defendant filed a “Motion to Augment the Record or in the Alternative to Take Judicial Notice of Official Police Report,” to which were attached copies of six pages of a report by the University of California Police Department regarding the January 22, 1985, arrest of defendant. The report states that, shortly after defendant was arrested, Officer Korbett advised defendant of “his Constitutional Rights” and defendant indicated he understood his rights and declined to speak to the officer. Defendant concedes that “[t]his document is not lodged with the court below” but urges this court, nonetheless, to augment the record to include the police report. “Augmentation is not available, however, for the purpose of adding material that was not a proper part of the record in the trial court. [Citation.]” (People v. Brooks (1980) 26 Cal.3d 471, 484 [162 Cal.Rptr. 177, 605 P.2d 1306].)
In the alternative, defendant asks us to take judicial notice of the document under Evidence Code section 452, subdivision (h), which authorizes judicial notice of “[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.” “Judicial notice under Evidence Code section 452, subdivision (h) is intended to cover facts which are not reasonably subject to dispute and are easily verified. These include, for example, facts which are widely accepted as established by experts and specialists in the natural, physical, and social sciences which can be verified by reference to treatises, encyclopedias, almanacs and the like or by persons learned in the subject matter. [Citation.]” (Gould v. Maryland Sound Industries, Inc. (1995) 31 Cal.App.4th 1137, 1145 [37 Cal.Rptr.2d 718].) Despite the State Public Defender’s rather surprising contention that a police report is a “source[] of reasonably indisputable accuracy,” we decline to take judicial notice of the truth or accuracy of an entry in a police report, because such a report is reasonably subject to dispute. (See People v. Medina, supra, 51 Cal.3d 870, 890.)
Accordingly, we deny defendant’s motion to augment the record to include the police report or, in the alternative, to take judicial notice of the police report.

 Contrary to the implication of Justice Werdegar’s concurring and dissenting opinion, we do not hold “that evidence of a defendant’s invocation of the right to remain silent is admissible whenever it might be useful to the prosecution’s case.” (Conc. and dis. opn. of Werdegar, J., post, at p. 200.) Nor do we hold that evidence of the reason for defendant’s silence is admissible to prove defendant was malingering. (Conc. and dis. opn. of Werdegar, J., post, at pp. 199-200; conc. and dis. opn. of Kennard, J., post, at pp. 196-197.) We hold that, under the circumstances of the present case, evidence that defendant consciously chose to *175 remain silent was admissible to rebut defendant’s assertion that his mental illness rendered him incapable of communicating.

 CALJIC No. 4.01 (5th ed. 1988 bound vol.), titled “Effect of Verdict of Not Guilty by Reason of Insanity,” states: “A verdict of ‘not guilty by reason of insanity’ does not mean the defendant will be released from custody. Instead, [he] [she] will remain in confinement while the courts determine whether [he] [she] has fully recovered [his] [her] sanity. If [he] [she] has not, [he] [she] will be placed in a hospital for the mentally disordered or other facility, or in outpatient treatment, depending upon the seriousness of [his][her] present mental illness. [¶] Moreover, [he] [she] cannot be removed from that placement unless and until the court determines and finds the defendant’s sanity has been fully restored, in accordance with the law of California, or until the defendant has been confined for a period equal to the maximum period of imprisonment which could have been imposed had [he] [she] been found guilty. [¶] So that you will have no misunderstandings relating to a verdict of not guilty by reason of insanity, you have been informed as to the general scheme of our mental health laws relating to a defendant, insane at the time of [his] [her] crimes. What happens to the defendant under these laws is not to be considered by you in determining whether the defendant was sane or not at the time [he] [she] committed [his] [her] crime[s]. Do not speculate as to if, or when, the defendant will be found sane. [¶] You are not to decide whether the defendant is not sane. You are to decide only whether the defendant was sane at the time [he] [she] committed [his] [her] crime[s]. If upon consideration of the evidence, you believe defendant was insane at the time [he] [she] committed [his] [her] crime[s], you must assume that those officials charged with the operation of our mental health system will perform their duty in a correct and responsible manner, and that they will not release this defendant unless [he] [she] can be safely returned into society. [¶] It is a violation of your duty as jurors if you find the defendant sane at the time [he] [she] committed [his] [her] offense[s] because of a doubt that the Department of Mental Health or the courts will properly carry out their responsibilities.”

 Defendant did object when the prosecutor stated, near the end of his argument, that it was “fallacious” and “improper” to consider whether a sentence of life in prison without parole would be adequate to protect society from defendant. The prosecutor added: “Moreover, that type insinuation or that idea literally makes you want to speculate as to whether or not [defendant] will be dangerous in the future.” Defense counsel objected on the ground that this was “improper argument,” and the trial court instructed the jury “to weigh the mitigating and aggravating circumstances and come to their decision.” Although defendant failed to specify the ground for his objection, it appears that the objection was prompted by the prosecutor’s reference to defendant’s future dangerousness. (See People v. Miranda (1987) 44 Cal.3d 57, 111 [241 Cal.Rptr. 594, 744 P.2d 1127].) Defendant does not contend on appeal that the prosecutor’s reference to future dangerousness was improper. It is clear the prosecutor was cautioning the jury not to speculate concerning defendant’s future dangerousness.

 Section 190.3 states, in pertinent part: “In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1. [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction. [¶] (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] (e) Whether or not the victim was a participant in the defendant’s homicidal conduct or consented to the homicidal act. [¶] (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct, [¶] (g) Whether or not defendant acted under extreme duress or under the substantial domination of another person. [¶] (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication. [¶] (i) The age of the defendant at the time of the crime. [¶] (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor. [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.”